# United States Court of Appeals
## For the First Circuit

No. 08-1604

CARLOS EDUARDO RIVAS-MIRA,

Petitioner,

v.

ERIC H. HOLDER, JR.,[*] ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE BOARD

OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Selya and Boudin, Circuit Judges.

Willilam P. Joyce and Joyce & Associates P.C. on brief for petitioner.
Gregory G. Katsas, Assistant Attorney General, Civil Division, Mark C. Walters, Assistant Director, Office of Immigration Litigation, and Anh-Thu P. Mai-Windle, Senior Litigation Counsel, on brief for respondent.

February 11, 2009

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Eric H. Holder, Jr. has been substituted for former Attorney General Michael B. Mukasey as respondent.

**SELYA**, **Circuit Judge**.  The petitioner, Carlos Eduardo Rivas-Mira, is a native of El Salvador.  He seeks judicial review of a final order of the Board of Immigration Appeals (BIA) affirming the decision of an immigration judge (IJ) that ordered his removal and denied him asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT).  After careful consideration of the briefs and record, we deny the petition.

Our sole focus is the denial of the asylum claim.[1]  The basic facts are straightforward.

The petitioner arrived illegally in the United States on January 22, 2005.  Two days later, federal authorities placed him in removal proceedings.  See 8 U.S.C. § 1182(a)(6)(A)(i).  He conceded removability and cross-applied for asylum, withholding of removal, and CAT protection.

Following a hearing, the IJ denied the petitioner's claims for relief.  She premised her decision on a finding that the petitioner's testimony lacked credibility.  At the same time she found, in the alternative, that the petitioner's testimony, even if credible, failed to demonstrate that he had been or would be persecuted on the basis of a statutorily protected ground.

---

[1] The petitioner conceded removability and has failed to advance any developed argumentation as to any of his other claims for relief.  Consequently, we treat those claims as abandoned. See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The linchpin of the IJ's decision — the adverse credibility determination — is woven out of perceived inconsistencies in the petitioner's testimony. Thus, we turn directly to that testimony.

The petitioner related that his troubles in El Salvador started while he worked as a machine operator for Bocadeli Food Products. He described an ongoing struggle between union organizers and company executives at his workplace. The former were looking to increase union influence and membership; the latter were seeking to thwart the organizers' efforts, partially by identifying and firing union sympathizers.

Among other things, the pro-union contingent employed a carrot-and-stick approach. On the one hand, the union offered to protect prospective members from violent gangs that roamed the area. On the other hand, the union assisted the gangs in targeting persons who either sided with management or resisted the union's blandishments. The petitioner had no desire to lose his job, but he worried about incurring the union's wrath. He tried to remain "neutral," but his efforts at neutrality came to naught.

The denouement took place on July 19, 2004. The petitioner testified that, on that date, two armed men boarded a bus transporting Bocadeli employees home after completing their shift. He recognized the men as members of a gang linked to union organizers.

The intruders relieved the passengers of their valuables (including bonuses received earlier that day). They then shot the petitioner at close range, wounding him in the hand and chest. No shots were fired at any other passenger. The petitioner speculated that his refusal to join the union was the reason why his assailants singled him out and shot him.

The petitioner further testified that, two weeks later, he met one of his assailants by happenstance. He thereafter began to receive anonymous telephone calls. The mysterious callers threatened to take his life if he chose to report his shooting to the police.

The petitioner indicated that the "bus incident" was not an isolated instance of violence. His brother was robbed under similar circumstances in November of 2004 and the robbers passed along a warning that the petitioner should not "open [his] mouth." Additionally, the petitioner vouchsafed that he knew of four coworkers who had been assaulted for providing information to management about union activity. Finally, he claimed that his cousin was killed by gang members in 2006 (after the petitioner had fled to the United States).

Comparing the petitioner's written application for asylum, his affidavit supplementing that application, and his hearing testimony, the IJ detected a bevy of discrepancies. The most important related to the petitioner's failure to mention, in

his asylum application, any connection between the bus incident and his supposed unwillingness to support the union. Indeed, his original filings did not refer at all to any union activity or union-related violence. Those omissions were all the more glaring when combined with evidence of the petitioner's statement to a border patrol agent, credited by the IJ, that the petitioner had "no fear of returning to El Salvador."

There were other inconsistencies as well. For example, the petitioner testified that he started working part-time for Bocadeli in 1997 and became a full-time employee two years later. This contrasted not only with his asylum application (which noted a starting date in 1996) but also with a letter from Bocadeli (which indicated that his employment had commenced in 2000). Similar inconsistencies plagued the petitioner's descriptions of the time he spent recuperating from the shooting. Although he testified that his injuries required him to miss two months of work, he submitted a letter from his social worker stating that he had missed only one month.

The petitioner appealed the denial of relief to the BIA, which affirmed the IJ's ukase. This timely petition for judicial review followed.

Ordinarily, the court of appeals reviews only the final order of the BIA. But where, as here, the BIA has adopted the IJ's decision in whole or in part, we review the pertinent portions of

the IJ's decision as well. See Bebri v. Mukasey, 545 F.3d 47, 49-50 (1st Cir. 2008); Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003). Factual findings, including credibility determinations, are assessed under the familiar substantial evidence standard. See Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007). That standard requires us to uphold the agency's findings so long as the record does not "compel a reasonable factfinder to reach a contrary determination." Chhay v. Mukasey, 540 F.3d 1, 5 (1st Cir. 2008). Put another way, such findings will stand whenever they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Segran, 511 F.3d at 5 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). Answers to abstract legal questions are reviewed de novo, with deference, however, to the agency's reasonable interpretation of statutes and regulations within its ken. Pan v. Gonzales, 489 F.3d 80, 85 (1st Cir. 2007).

To qualify for asylum, an alien must establish that he is a refugee within the meaning of 8 U.S.C. § 1101(a)(42). Satisfying this burden requires a showing of either past persecution or a well-founded fear of future persecution if repatriated, on account of one of five enumerated grounds, namely, race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1101(a)(42)(A); see also Makhoul v. Ashcroft, 387 F.3d 75, 80-81 (1st Cir 2004). An alien's own

testimony may be adequate to carry this burden.  Bebri, 545 F.3d at 50.  Nevertheless, the alien's testimony need not be taken at face value; that testimony may be discounted or disregarded if the IJ reasonably deems it to be "speculative or unworthy of credence."  Id.  Hence, "an adverse credibility determination can prove fatal" to an asylum claim.  Id. (quoting Pan, 489 F.3d at 86).  We must inquire, then, as to whether this is such a case.

In denying asylum, the IJ concluded that the petitioner's story was incredible.  The petitioner disputes that characterization, alleging that the adverse credibility determination placed excessive weight on trivial inconsistences.  Upon close perscrutation, we find that allegation unfounded.

Before beginning our explanation, we first must answer a threshold question.  The petitioner applied for asylum on January 11, 2006.  Because his application postdates the enactment of the REAL ID Act, Pub. L. 109-13, 119 Stat. 302 (2005), the credibility definition at issue here is subject to a provision of that Act, codified at 8 U.S.C. § 1158(b)(1)(B)(iii), rather than to the preexisting "heart of the matter" rule.  The earlier rule required that an adverse credibility finding be based on inconsistencies that "pertain to facts central to the merits of the alien's claims."  Bebri, 545 F.3d at 50 (quoting Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006)).  The new statute disavows that test; it provides that a factfinder may base a credibility determination on

inconsistencies, inaccuracies, or falsehoods "without regard to whether [any such inconsistency, inaccuracy, or falsehood] goes to the heart of the applicant's claim." 8 U.S.C. § 1158 (b)(1)(B)(iii). We therefore proceed to evaluate the IJ's adverse credibility determination under that standard and in light of the totality of the circumstances. See, e.g., Xiu Xia Lin v. Mukasey, 534 F.3d 162, 167 (2d Cir. 2008); Kadia v. Gonzales, 501 F.3d 817, 822 (7th Cir. 2007); Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1233 (11th Cir. 2006).

The petitioner attempts to circumvent this obstacle by arguing that the new test includes a rationality requirement, thus rendering it functionally equivalent to the old "heart of the matter" rule. This reasoning relies heavily on a footnote in Lin v. Mukasey, 521 F.3d 22, 28 n.3 (1st Cir. 2008). The petitioner reads the Lin footnote as indicating that the new statute should be interpreted narrowly. We reject that crabbed reading.

In Lin, we examined the background of this new provision of the REAL ID Act, noting that its principal purpose was to eliminate a limitation, elaborated by the Ninth Circuit, on the type of inconsistencies upon which an IJ could rely in assessing credibility. See id. (citing Abovian v. INS, 257 F.3d 971, 977-79 (9th Cir. 2001) (Kozinski, J., dissenting from denial of rehearing en banc)). The net effect of the neoteric provision was to scrap the "heart of the matter" rule. See id.; see also H.R. Rep. No.

418, 109th Cong. (2005), reprinted at 151 Cong. Rec. H536-41 (daily ed. Feb. 10, 2005).  However, we warned that even under the new standard, credibility determinations nonetheless must "be 'reasonable' and 'take into consideration the individual circumstances' of the applicant."  Lin, 521 F.3d at 28 n.3 (quoting H.R. Rep. No. 109-72, at 167, reprinted in 2005 U.S.C.C.A.N. 240, 292).

The Lin court recognized that this language, if taken literally, might create a "rationality requirement," but left open the question of whether (or to what extent) an adverse credibility determination can be based on inconsistencies not directly related to the central issues in an alien's case.  Id.

Although the petitioner labors to pursue this subject, we have no occasion to explore it here.  The "heart of the matter" rule is dead, and the main inconsistencies on which the IJ relied — the absence of any reference to union activity in the petitioner's initial submissions and his failure there to link the bus incident to union strife — cannot be dismissed as a minor blemish.  These inconsistencies go to the essence of the petitioner's claim: after all, the assailants' motivation for singling out the petitioner was crucial to his assertion that he had been persecuted for, and feared future retribution on account of, his failure to adopt a pro-union stance.  If the new statute imposes a rationality requirement, that requirement would be satisfied here.

The petitioner has a fallback position. He lamely suggests that the trauma of the attack prevented him from discussing the matter fully during the initial stages of the asylum process. That suggestion lacks any credible support in the record. The petitioner had no difficulty in describing the attack in great detail, and it is implausible that he would have recalled the attack itself but blocked out its union-related aspects.

We need not tarry. While the inconsistencies anent the petitioner's employment history and recuperation period may be fribbling, the main inconsistencies noted by the IJ are of a type and kind that create strong doubts about the veracity of the petitioner's tale. Of course, the petitioner attempted to explain away these anomalies, blaming others for them. However, his explanations are not convincing. That is especially so in light of his stated lack of any fear of returning to El Salvador. In all events, the IJ was not <u>required</u> to accept those explanations.

To sum up, the inconsistencies, collectively, viewed in light of the totality of the circumstances, constitute substantial evidence sufficient to support the IJ's adverse credibility finding. <u>See</u>, <u>e.g.</u>, <u>Bebri</u>, 545 F.3d at 51; <u>see also</u> <u>Pan</u>, 489 F.3d at 86 (explaining that while "[s]ome of these inconsistencies, in isolation, may seem like small potatoes . . . their cumulative effect is great"). In short, we see nothing in the record before

us that would compel a conclusion that the petitioner's testimony was credible.

To say more would be to paint the lily. Once we accept the adverse credibility determination — as we must — the petitioner's case collapses. Without his own (incredible) testimony, the record does not show that the petitioner ever displayed an anti-union animus, let alone that he was targeted on that account.

We need go no further.[2] For the reasons elucidated above, we deem the denial of asylum to be supported by substantial evidence on the record. Consequently, the petition for review must be <u>denied</u> and the final order of removal sustained.

**So Ordered**.

---

[2] Given our rationale, we have no need to explore the IJ's alternative holding.