STAHL, Circuit Judge,
dissenting.
I dissent because the majority has repeated the same mistakes of the Board of Immigration Appeals (BIA) and the Immigration Judge (IJ) by failing to consider the complete record and misstating the relevant facts of this case.
The majority commits two related errors. First, the majority overlooks that the IJ and BIA denied Celvyn’s [10] asylum application without considering the actual *77 claim he put forth. Both courts characterized Celvyn’s claim as alleging past persecution based merely on a dispute among neighbors over property boundaries. This error resulted because both administrative courts limited their understanding of the factual basis of Celvyn’s claim to the oral testimony Celvyn gave when he was just thirteen years of age, testifying about events that occurred when he was a young child of five to eleven years old. In fact, the extensive supporting evidence submitted in this case supports Celvyn’s claim that he suffered violent persecution on account of an imputed political opinion attributed to him because of his family’s long-standing land activism. Where administrative courts render a decision that does not address the basis of an asylum applicant’s claim, as they did here, we are required at a minimum to remand for consideration of the actual claim put forth by the applicant. We cannot, as the majority does here, simply review the facts in the first instance and affirm based on a rationale not considered by the agency.
Second, even if the majority is correct that it can remedy the lower courts’ failure to consider the substance of Celvyn’s claim by conducting a review of the facts in the first instance on appeal, the majority’s attempt'to review the record is ineffective. While the majority makes reference to some of Celvyn’s extensive supporting evidence it still mischaracterizes the basic content of his asylum claim, largely limiting its analysis to the oral testimony of a child, diagnosed with post traumatic stress disorder (PTSD), and testifying about events that occurred when he was very young. A review of the record as a whole compels the conclusion that Celvyn is entitled to the protections afforded to refugees.
The majority’s decision also raises a larger concern. By approving the administrative courts’ failure to consider the substance of Celvyn’s asylum claim and by essentially adopting this same approach itself, the majority avoids the obligation of our court system to treat children who seek refugee protection with the care and attention required by law, administrative guidance and international norms. This failure has resulted in a decision that is both legally incorrect and that inflicts a terrible human price on a child[11] who has turned to the United States for protection.
Below, I first recount the factual basis of Celvyn’s asylum claim, drawing as I must from the complete record. Second, I explain that a remand is required because the administrative courts failed to issue a merits decision on the claim actually presented by Celvyn. Third, I explain how the majority and the courts below misapplied the asylum standard to Celvyn’s claim. Fourth, I explain how the record evidence compels the conclusion that Celvyn suffered persecution on account of his family’s political activities and why he therefore should be granted asylum.
I. The Factual Basis of Celvyn’s Claim
The facts as drawn from the complete record are as follows. Celvyn’s family has long been involved in political activism in their rural town of Arimis, in the province of Olancho, Honduras, and has suffered decades of persecution on account of that activity. Celvyn’s step-grandfather, Angel Herrera, was a founding member of Lined, a local activist organization of landless peasants that organized land takeovers *78 and other actions which were legally permissible under Honduran land reform legislation of the time. Lincol was named after Lincoln Coleman, who was a land-reform leader in Olancho province and executive secretary of the League of Peasants of Olancho in the 1970s. The Lincol activists were opposed by the wealthy land-owning elite in the area. The landowners were aided and supported by the local police and military. In 1982 or 1983, Angel was killed by a group of soldiers because of his involvement in Lincol and the land reform movement. In 1982, another family member, the brother-in-law of Celvyn’s mother’s sister, was also killed for his involvement in the Lincol movement.
Celvyn’s grandmother was an active and visible member of Lincol and the Liberal Party, a leftist political party supportive of land rights for landless peasants. In the 1970s, she was involved with Lincol through her husband Angel. She also supported the group during land invasions and other actions by delivering and selling food and sweets to the activists. She brought her young daughter, Celvyn’s mother, along with her when she sold the food. Several years after her husband Angel’s murder, Celvyn’s grandmother put the Lincol beliefs into practice by squatting on an unused piece of land in the town of Arimis and building her home on it, which greatly antagonized her wealthy, land-owning neighbors. She flew the red Liberal Party flag above that home, while her wealthy neighbors flew the blue National Party flag.
The family continued to be targeted for its activism when Celvyn’s uncle, Carlos Augusto Romero Erazo, who was involved with Lincol, was murdered in 1996. He was killed by Gregorio (“Godo”) Mejia, a cousin from the family that owned the land on which Celvyn’s mother was squatting. The family reported the murder to the authorities, who issued a criminal indictment, but never arrested Godo or otherwise resolved the case. The earliest memory that Celvyn testified about was witnessing the dead body of his uncle with a machete wound to the head, a significant traumatic event for a five-year-old child.
From his earliest memories, Celvyn recalls neighbors harassing and threatening his family for their political views. When Celvyn was three, his mother fled to the United States to escape a brutally abusive relationship with a member of one of the wealthy local families. Celvyn was left to live with his elderly grandmother and his two young cousins in the home in Arimis that sat on appropriated land. Though very young, he possessed an age-appropriate understanding of the political divisions between his family and their wealthy neighbors.
In addition to the trauma that he experienced at the age of five, when he witnessed his uncle’s dead body, Celvyn was also repeatedly taunted and physically assaulted by a neighbor named Hubert Mejia, who was a member of the same wealthy family that owned the land on which Celvyn’s grandmother was squatting. Hubert would throw stones at Celvyn when he was walking outside and on two occasions he brutally attacked the family when Celvyn, his grandmother, and his two young cousins were alone in the house. Hubert wielded a machete during both attacks. Though he did not understand the nuances, Celvyn perceived that Hubert, and other neighbors like him, did not like Celvyn’s family because of political and economic disputes — he noted that during the attacks Hubert called him and his grandmother “Communists” and “people that are dying, that are starving.”
Hubert’s first violent assault on the family occurred when Celvyn was about ten *79 years old, though the record is unclear on this point. During the attack, Hubert wielded a machete and chased Celvyn and his grandmother around the home, repeatedly punching and hitting Celvyn. Hubert threw his weapon at Celvyn, leaving a large, eight inch scar on Celvyn’s right leg. A photo of the scar was entered into evidence.
Fearing for his safety after this assault, Celvyn’s grandmother arranged for Celvyn and his two young cousins to leave Honduras and travel to the United States. However, Celvyn and his cousins were apprehended in El Salvador, presumably by Salvadoran authorities, and returned to Arimis. Following his return, Celvyn’s grandmother kept him indoors and did not let him go to school, for fear of more violence from those opposed to her activism. In early 2002, when Celvyn was eleven, his grandmother’s fears were substantiated when Hubert again attacked the family. This time, Hubert used a machete to ransack and destroy the entire house, slashing windows and the interior of the house. He also used his machete to cut down and destroy the agriculture and vegetation surrounding the house. Celvyn, his grandmother, and his young cousins were at home during the attack and feared for their lives. The violence toward the elderly grandmother and three young children, along with the destruction of the home, were so overwhelming that when Celvyn’s aunt (his mother’s sister) saw the aftermath, she suffered a heart attack and died four days later. A death certificate for the aunt, admitted into evidence, showed that she died on April 2, 2002. Shortly after this second attack, Celvyn’s grandmother successfully sent Celvyn to the United States.
Celvyn also testified, in an appropriately child-like way, that neither he nor his grandmother called the police to report the many assaults on the family because, “[t]he police wouldn’t do anything here.” He also testified that, “Where I was living, there was no police force.” The family’s belief that the authorities would not protect them was a conclusion based on decades of experience. The landowners who opposed the family’s work with Lined enjoyed the active support of the local police, and military and government soldiers had killed Celvyn’s step-grandfather. When the family reported the uncle’s murder in 1996, the authorities never arrested or prosecuted the landowner who was responsible. Indeed, the Department of State confirmed this trend, noting in its 1999 Country Report that the “local landowners” in Olancho province had formed “large-scale vigilante groups,” apparently without resistance from the authorities.
In short, by 2002, Celvyn felt under siege, confined to his home, fearful of the next instance of violence from his neighbors and sure that no one could or would protect him. As he put it, “[I]f I would be leaving the house, I assume that the one neighbors would get me on one side, the other neighbors would get me on the other side.”
The violence inflicted on Celvyn because of his family’s land reform activism was not the only physical and emotional trauma this young boy experienced in Arimis. As the record shows, Honduras suffers from a tremendous gang problem. Though he was very young, about eight or nine years old, Celvyn faced attempted recruitment by older gang members in his town. He resisted this recruitment and suffered terribly as a result. Gang members harassed him on his way to and from school, physically bullied him, and tried to steal his money. They also threw a snake at him, and he had to fend off sexual assaults from the same gang members. In the worst incident, gang members brought Celvyn to *80 the roof of a small house and threw him down toward the ground, where he became entangled in barbed wire. He could not free himself and believed he had been left there to die. According to Celvyn’s treating psychologist, he has visible scars from the barbed wire on his back and right arm. Fortuitously, a family friend, whom Celvyn called “Uncle,” happened upon him and freed him from the barbed wire.
Finally, Celvyn and his mother testified consistently that if Celvyn were to return to Honduras he would have no one to care for him. All of his immediate and extended family members are either dead or live in the United States, with the exception of his biological father and grandmother. As for the father, Celvyn repeatedly stated under probing cross-examination that his dad was an absentee father who never raised or cared for him and would not take care of him now. In addition, though his father had been deported to Honduras, neither Celvyn nor his mother knew where he was or had had any contact with him since his departure.
As for Celvyn’s grandmother, she went into hiding in 2002, the year she sent Celvyn to the United States. The family did not hear from her for four years until one of Celvyn’s aunts traveled to Honduras in 2006 to find her. According to Celvyn’s mother’s supplemental affidavit, the aunt found that the grandmother had returned to Arimis, was living in the same house on the appropriated land, was elderly and ill, and feared for her life. The grandmother reported that the wealthy neighbors had made it clear that they were opposed to her return to Arimis.
II. Decisions Below
A review of the decisions issued by the IJ and the BIA shows that these administrative bodies failed to render a decision on the claim actually put forth by Celvyn, that he suffered persecution on account of a political opinion imputed to him based on his family’s long-standing land reform activism. They only considered whether Celvyn suffered past persecution on account of a dispute with what they termed a “disgruntled neighbor.” This was not Celvyn’s claim. Worse, they drew exclusively from the child applicant’s oral testimony to determine the universe of facts supporting his claim. Given that the agency failed to address the actual claim and evidence put forth by Celvyn, this case should be remanded for consideration of the merits of the actual claim. See Gailius v. I.N.S., 147 F.3d 34, 44 (1st Cir.1998) (“‘[A] reviewing court ... must judge the propriety of [administrative] action solely by the grounds invoked by the agency.’ ” (alteration in original) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947))); Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 349 (1st Cir.2004) (“It is a bedrock principle that a court may only uphold an administrative action on a rationale advanced by the agency in the administrative proceeding.”).
It is impossible to find anywhere in the BIA’s very abbreviated opinion a discussion of the claim actually made by Celvyn or any consideration of his extensive supporting evidence. In its opinion, which amounts to one page of substantive text, the Board provides two sentences purporting to explain the factual basis of Celvyn’s political persecution claim, which are worth quoting in full:
In addition, his grandmother’s neighbor, Hubert, destroyed his grandmother’s house and would call the respondent names and throw stones at him. The respondent did not know why Hubert did such things.
This beggarly effort to set forth the basis of Celvyn’s persecution claim does not rise *81 to the bare minimum that we should expect from a responsible administrative court.[12] The BIA grossly misstates the content of Celvyn’s claim and refers only to Celvyn’s oral testimony to discern the factual support for his claim. The Board went on to dismiss the political persecution claim in one sentence, opining that “the actions of a disgruntled neighbor ... did not rise to the level of persecution.” The BIA provided absolutely no analysis of Celvyn’s actual claim, meaning there is no decision on the merits for the majority to review.
The IJ’s opinion, though longer than the BIA’s, is no better. The IJ did not analyze whether Celvyn’s claim — that he was persecuted on account of an imputed political opinion based on his family’s decades of land reform activism — rose to the level of the statutory definition for political asylum. The section of the IJ’s opinion labeled “Past Persecution” reveals that the IJ limited the factual basis of Celvyn’s claim to the following:
The Respondent testified that “Hubert,” his former neighbor in Honduras, destroyed his grandmother’s home and windows with a machete, frequently called him a “Communist,” threw stones at him, and on one occasion, hit him in the leg with a machete.
Thus, the IJ ignored Celvyn’s imputed political opinion claim and the extensive evidence of the family’s decades of activism and resulting persecution. The above excerpt also shows that the IJ drew only from Celvyn’s oral testimony to analyze his past persecution claim, ignoring the powerful supporting evidence introduced at trial.[13] Further, the IJ’s conclusion about Celvyn’s past persecution claim starkly shows that he simply did not consider the claim Celvyn actually put forth:
While these events were, without a doubt, troubling, they amount to no more than a series of isolated altercations with a disgruntled neighbor.
This conclusion does not address Celvyn’s claim or evidence. Finally, the IJ stated that:
There is no evidence in the Record of Proceedings that the Respondent was ever physically punished for possessing a belief or characteristic that others sought to overcome.
This stunningly inaccurate statement reveals that the IJ simply did not consider Celvyn’s assertion of imputed political opinion or his evidence of his family’s decades-long land activism and resulting persecution.
Even though the IJ’s decision plainly does not address Celvyn’s claim, the majority thinks the U nonetheless did a good enough job because he (1) narrated the content of the mother’s testimony in a section of the opinion entitled “Testimonial Evidence”, and (2) included a list of the *82 documentary evidence submitted by Celvyn and asserted that he had considered all such evidence. The problem, however, is that the IJ’s analysis of Celvyn’s past persecution claim, excerpted above and appended in full to this dissent, gives zero indication that the IJ actually considered Celvyn’s imputed political opinion claim or that he took into account the evidence submitted in support of that claim. The IJ committed a basic error by not considering the claim actually put forth by the applicant, and the majority has chosen to excuse the IJ’s failure. Quite simply, Celvyn was entitled to receive a merits decision on the claim and evidence he submitted to the immigration court. Thus, remand is necessary.
III. The Merits of Celvyn’s Asylum Claim
My preliminary objection, as noted above, is that Celvyn’s claim did not receive due consideration below, thus requiring a remand. However, even if the courts below issued a valid merits decision, I believe a review of the entire record shows there is not substantial evidence to support the denial of Celvyn’s asylum claim. And though our standard of review is highly deferential in asylum cases, the evidence presented in this case indeed compels the conclusion that Celvyn suffered past persecution on account of an imputed political opinion. The administrative courts below reached the opposite conclusion by relying exclusively upon the oral testimony of a young child diagnosed with PTSD rather than considering the record as a whole, which is strongly supportive of his claim of persecution. Relying on oral testimony while ignoring other strongly supportive record evidence was precisely the basis of our remand in Mukamusoni v. Ashcroft, 390 F.3d 110, 120-21 (1st Cir.2004), and should be here as well. Further, in ignoring Celvyn’s persuasive supporting evidence, the courts below violated case law, administrative guidance, and international norms regarding how courts should analyze children’s asylum claims.
A. Asylum Standard
Because the majority’s discussion of the standard for political asylum is incomplete, I relate the full test below. An applicant may establish eligibility for asylum based on past persecution alone. See 8 CFR § 1208.13(b). A finding of past persecution gives rise to a presumption that the applicant also has a well-founded fear of future persecution. See id. § 1208.13(b)(1). This presumption can only be rebutted by a showing that either changed circumstances have rendered the fear of future persecution moot or that by relocating to another part of the country the applicant can avoid future persecution. See id. § 1208.13(b)(l)(i). Even if the presumption is successfully rebutted, the applicant may still be granted asylum if (1) the applicant has demonstrated a compelling reason for being unwilling or unable to return to his country arising out of the severity of the past persecution, or (2) the applicant has established a reasonable possibility that he may suffer other serious harm upon removal to his home country. See id. § 1208.13(b)(l)(iii).
As for our standard of review, we review the factual findings below for substantial evidence, meaning we must ask whether the lower courts’ conclusions are “supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Rivas-Mira v. Holder, 556 F.3d 1, 2009 WL 323469, at *4 (1st Cir. February 11, 2009) (emphasis added). Importantly, “deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole.” Cordero-Trejo v. INS, 40 F.3d *83 482, 487 (1st Cir.1994) (emphasis added). Importantly, we have found reversible legal and factual error where the BIA only drew on the respondent’s oral testimony and ignored significant supporting evidence, including the respondent’s affidavit. See Mukamusoni v. Ashcroft, 390 F.3d 110, 120-21 (1st Cir.2004).
B. Age and Mental Status of the Respondent
The IJ found Celvyn’s testimony credible. However, the quality of the information Celvyn was able to relay in his oral testimony was undermined by three significant factors, none of which was considered by the IJ or the BIA. First, Celvyn’s testimony recounted events that occurred when he was between the age of five, when he witnessed the machete-wounded body of his murdered uncle, and eleven, when he fled Honduras. Second, Celvyn gave his oral testimony when he was just thirteen and in the fifth grade. Third, prior to his oral testimony, Celvyn was diagnosed by a psychologist at the Cambridge Health Alliance with post traumatic stress disorder, which she concluded was caused by “exposure to traumatic events” in Honduras, including being “hung on a barb wire fence,” being “cut with a machete,” and experiencing “death threats, attempted rapes and other forms of violence where he feared for his life.”[14]
When children seek asylum, the courts must approach their cases with particular care for a variety of reasons. First, as case law and U.S. Department of Justice policy reflect, a child experiences traumatic events in ways that are different from an adult, and a child is less likely to understand and to be able to explain the reasons that violence has been inflicted upon him. See, e.g., Civil v. I.N.S., 140 F.3d 52, 62 (1st Cir.1998) (dissenting opinion); Kahssai v. I.N.S., 16 F.3d 323, 329 (9th Cir.1994); “Guidelines for Children’s Asylum Claims,” U.S. Department of Justice, INS Policy and Procedure Memorandum (“1998 DOJ Memo”), December 10, 1998, available at 1998 WL 34032561 (“The harm a child fears or has suffered ... may be relatively less than that of an adult and still qualify as persecution.”). For this reason, the U.S. Department of Justice has mandated that, when considering a child’s asylum claim, an immigration judge must, among other things, evaluate the child’s testimony in light of his age, development, and experience:
Judges should recognize that children, especially young children, usually will not be able to present testimony with the same degree of precision as adults. Do not assume that inconsistencies are *84 proof of dishonesty, and recognize that a child’s testimony may be limited not only by his or her ability to understand what happened, but also by his or her skill in describing the events in a way that is intelligible to adults.
“Interim Operating Policies and Procedures Memorandum 04-07,” U.S. Department of Justice, September 16, 2004. Because of the difficulty a child is likely to have in explaining what happened to him and why,[15] the United Nations High Commissioner for Refugees (UNHCR) has advised that asylum adjudicators should give additional weight to objective evidence in order to supplement the child’s own subjective testimony:
Although the same definition of a refugee applies to all individuals regardless of their age, in the examination of the factual elements of the claim of an unaccompanied child, particular regard should be given to circumstances such as the child’s stage of development, his/her possibly limited knowledge of conditions in the country of origin, and their significance to the legal concept of refugee status, as well as his/her special vulnerability. Children may manifest their fears in ways different from adults. Therefore, in the examination of their claims, it may be necessary to have greater regard to certain objective factors, and to determine, based upon these factors, whether a child may be presumed to have a well-founded fear of persecution.
UNHCR, “Policies and Procedures in Dealing with Unaccompanied Children Seeking Asylum,” February 1997, 12-13 (emphasis added). Nor is this guidance unique to the immigration context. It has numerous correlates in other areas of juvenile justice. See Kristine K. Nogosek, “It Takes a World to Raise a Child: A Legal and Public Policy Analysis of American Asylum Legal Standards and Their Impact on Unaccompanied Minor Asylees,” 24 Hamline L.Rev. 1, 13-17 (2000) (outlining the protections and assistance afforded to children in other areas of law, including contract, tort, and criminal law).
In Celvyn’s case, the IJ[16] and the BIA limited their accounts of the basis of Cel *85 vyn’s asylum claim to the oral testimony given by this young boy. Limiting review to such a small portion of the record would be inexcusable in any case, see Mukamusoni, 390 F.3d at 120-21, but it is particularly so in a case involving a minor. Reading the transcript of Celvyn’s oral testimony, one finds that it is exactly what one would expect from a thirteen-year-old discussing events that occurred when he was five to eleven years old. His description of multiple incidents of violence is simplistic;[17] he can only offer basic explanations for why such violence was inflicted upon him and his family;[18] and he shows only a very basic, one might say “childlike,” understanding of the political context of the trauma that engulfed his young life.[19] Despite this, three courts have ignored the voluminous additional evidence that explains in great detail the political causes of the violence that Celvyn and his family experienced. The IJ, BIA, and now, to a large extent, the majority have contented themselves with quoting from Celvyn’s simplistic oral testimony, using such quotations to purportedly show that there really is no meat on the bones of his asylum claim. This strikes me as particu *86 larly troubling given that the respondent is a young child who, by virtue of his age and development, simply cannot carry his asylum burden based on his oral testimony alone.
C. The Record Evidence
In this section, I expand upon the sources of evidence contained in the 1,800-plus page record, evidence that was ignored by the IJ and BIA and inadequately considered by the majority.
1. The Mother’s Oral Testimony
Celvyn’s mother’s testimony explained what Celvyn, by virtue of his age, could not. In short, the mother explained (a) the severity and pervasive nature of the trauma that Celvyn experienced, which goes to past persecution; (b) how the ongoing trauma that he experienced was the result of the family’s political activism, which goes to the on-account-of element; and (c) how the government was unwilling or unable to protect the family, and at times even complicit in carrying out the persecution.
In order to conclude that Celvyn did not present sufficient evidence to compel the conclusion that he qualifies for asylum, the majority must explain away the validity of the powerful evidence contained in the mother’s testimony. It does so by misinterpreting the IJ’s findings as to the credibility and reliability of the mother’s testimony. Because this is such an important issue, I quote the immigration judge’s complete findings as to the mother’s testimony, who is referred to as Ms. Romero:
The court notes that Ms. Romero’s testimony was often unclear and contained numerous inconsistencies as compared to her Application for Asylum, especially with regard to the reasons why she fled Honduras and her family’s involvement with the “Lineol” organization. Those discrepancies contained in Ms. Del Carmen Romero’s testimony speak more to whether Ms. Del Carmen Romero was credible in her own Application for Asylum, rather than whether the Respondent is credible, especially since her testimony otherwise generally corroborated the Respondent’s testimony. As the inconsistencies and discrepancies contained in Ms. Del Carmen Romero’s testimony do not affect the heart of the Respondent’s asylum claim or his overall narrative of “Hubert’s” actions or the actions of the “Maras,” they therefore do not prompt a negative credibility finding for the Respondent.
The IJ here made findings on three separate credibility questions: (1) the credibility of Romero as to her own asylum claim; (2) the impact of Romero’s inconsistencies on Celvyn’s credibility; and (3) the reliability of Romero’s evidence as it related to the factual basis of Celvyn’s asylum claim. I take each in turn.
First, the IJ found that Romero’s testimony contained inconsistencies between what she placed in her own written asylum application, which was filed in 1996, and what she testified to orally at Celvyn’s asylum hearing in 2005. There is no question that this is true. Romero, as she explained herself, attempted to get work authorization papers after she arrived in the United States. She paid a “notary public” named “Carolina” to fill out papers on her behalf in English, papers that Romero could not read and which were not read back to her in Spanish. Romero thought it was a work permit application but in fact it was an asylum application. The information “Carolina” put on the form was filled with inaccuracies, as Romero freely admitted during oral testimony. As the government pointed out later in cross-examination, this same “Carolina” was ar *87 rested for immigration fraud at a later date.
Therefore, the IJ’s comment that there were inconsistencies between Romero’s oral testimony at Celvyn’s hearing and her previously-adjudicated asylum application is absolutely correct. However, the IJ rightly concluded that this bore solely on Romero’s credibility as related to her own asylum claim. And because her own asylum claim had already been adjudicated years prior and was in no way at issue in Celvyn’s case, this was a conclusion about a prior legal claim that had no legal relevance to the present proceedings.
Second, because the IJ found that Romero’s testimony “otherwise generally corroborated” Celvyn’s testimony, he found that the inconsistencies between her oral testimony at Celvyn’s trial and her admittedly inaccurate, previously-adjudicated asylum claim had no negative impact on Celvyn’s credibility. This, too, was a fair conclusion, and one that bolsters Celvyn’s claim.
Third, as to the reliability of Romero’s testimony with regard to Celvyn’s asylum claim, the IJ plainly found her testimony consistent with Celvyn’s and therefore reliable. As the IJ said, he found that her testimony “generally corroborated” Celvyn’s testimony. He also found that any inconsistencies between her testimony at Celvyn’s trial and her own asylum claim did not “affect the heart of the Respondent’s asylum claim or his overall narrative.” Thus, her testimony as related to Celvyn’s claim is rightly before this court for review.[20]
The majority asserts that “the IJ did not ... make explicit credibility findings regarding the mother’s ... testimony.” However, as I have shown, the text from the IJ’s opinion plainly contradicts this contention.[21] Because the majority misreads the IJ’s findings, it discounts the entirety of the mother’s testimony, leaving the child’s oral testimony to stand alone as the only oral testimony considered by the majority. The majority erred in doing so, particularly given that Celvyn’s age imposed a duty on the court to broadly consult all available and reliable evidence to understand his claim.[22]
*88 2. Other Supporting Evidence
In addition to the mother’s testimony, Celvyn also presented unusually strong supporting evidence of his claim. These documents include the following. (1) A written report from Dr. Angela Radan, Cambridge Health Alliance, diagnosing Celvyn with PTSD because of the specific traumatic events that form the basis of his asylum claim.[23] (2) An affidavit from a Honduran attorney with an LLM from Harvard University and an expertise in Honduran human rights. She lays out the history of land reform struggles in Olancho province, the citizen groups like Lincol that engaged in land invasions and were “met with violent resistance” by land-holding families, supported by “local police and military authorities,” and the political violence spurred by the contest between the Liberal and National parties.[24] (3) An affidavit from Mark Bonta, Professor of Geography at Delta State University, an expert on land conflicts in Olancho province, who spent four years in Olancho researching the political strife over land ownership in the area. He details the history of the formation of the Lincol group in the 1970s, the death of the group’s founder Lincoln Coleman in the Horcones/Santa Clara massacre in 1975, the on-going political dispute over land in Olancho between peasants and landowners, backed by the military, and the violent political repression inflicted on activists because of their work for land reform.[25] (4) Supporting documentation about the Horcones/Santa Clara massacre. (5) Celvyn’s affidavit, which recounts in age-appropriate terms that his family had long-running problems with wealthy neighbors related to land issues and politics. (6) The affidavit of Celvyn’s mother, detailing the family’s political activism with Lincol and the resulting violence they experienced. (7) A supplemental affidavit from Celvyn’s mother declaring that Celvyn’s grandmother had been located after four years in hiding, that she had returned to her home in Arimis, was very ill, and was fearful for her life because her wealthy neighbors were opposed to her return. (8) A 1996 death certificate for Celvyn’s uncle indicating that he was killed by a machete wound, and a criminal indictment issued for Saul Gregorio (“Godo”) Mejia for the murder. (9) Affidavits from Erin Scheick,[26] a scholar with expertise in gang recruitment and violence in Honduras, and Gustavo Zelaya, legal counsel for Casa Alianza, the leading *89 advocacy organization for street children in Honduras, discussing the risks Celvyn faces if he is returned to Honduras.
The Id’s opinion fails to review the content of this evidence,[27] and the BIA, in its cursory two-page opinion, neither mentions nor considers any of the above evidence. The majority attempts to remedy the administrative courts’ failure to consider the record as a whole by making some attempt to reference this material. But mere citation is a far cry from analysis. Further, the majority dismisses the relevance of important portions of Celvyn’s supporting evidence merely because Celvyn’s oral testimony did not refer to the same material.[28]
D. Celvyn’s Eligibility for Asylum
1. The Past Persecution Claim
In contrast to the majority, I conclude from my review of the record that there is not substantial evidence to support the lower courts’ conclusion that Celvyn did not suffer past persecution on account of imputed political opinion. More than that, I believe the record compels the opposite conclusion and that substantial evidence supports the conclusion that Celvyn suffered past persecution and has otherwise met his asylum burden. See I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (“To reverse the BIA finding we must find that the evidence not only supports that conclusion, but compels it.”); Bellido v. Ashcroft, 367 F.3d 840, 846 (8th Cir.2004) (reversing BIA’s denial of asylum, finding substantial evidence support for granting asylum, and remanding for proceedings consistent with opinion); Osorio v. I.N.S., 18 F.3d 1017, 1023, 1033 (2d Cir.1994) (reversing BIA denial of asylum, finding that applicant has met his burden in “demonstrating eligibility for political asylum,” and ordering grant of asylum and withholding of deportation).
There is no doubt that Celvyn’s family was deeply engaged in advocating for land reform for several decades in their community, and that this activism led to severe reprisals, including several assassinations of family members. Celvyn found himself living with the family’s elderly matriarch, who was an active and visible political activist, and as a result Celvyn suffered the same persecution that his many family members had, merely because of a political opinion imputed to him. See Vasquez v. I.N.S., 177 F.3d 62, 65 (1st Cir.1999) (“An imputed political opinion, whether correctly or incorrectly attributed, may constitute a reason for political persecution within the meaning of the [Immigration and Nationality] Act.”) (quoting Ravindran v. I.N.S., 976 F.2d 754, 760 (1st Cir.1992)); Mema v. Gonzales, 474 F.3d 412, 417 (7th Cir.2007) (“[A]sylum is available to per *90 sons who have been persecuted based on imputed political opinion, including situations where a persecutor attributes the political opinion of one or more family members to the asylum applicant.”) (emphasis in original); Ananeh-Firempong v. I.N.S., 766 F.2d 621, 627 (1st Cir.1985) (same).
As the Justice Department has concluded, a child’s claim of past persecution can “be based on imputed political opinion.” See “1998 DOJ Memo,” available at 1998 WL 34032561. In fact, the Department advises that an “adjudicator should carefully review the family history of the child ” where the child claims persecution on account of an imputed political opinion. Id. (emphasis added). That is precisely the review that was lacking in this case.
In addition, unlike the majority, I believe the threats and violence that Celvyn experienced on account of an imputed political opinion rose to the level of persecution. Celvyn, who was a young child in elementary school at the time, was physically assaulted on two occasions by a man wielding a machete. The record shows that he bears the physical and psychological wounds of that violence to this day. Such brutal attacks on a very young child, whose only protection was his elderly grandmother, obviously rise well above our requirement that the harm “add up to more than mere discomfiture, unpleasantness, harassment, or unfair treatment.” Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir.2005). By the time his grandmother decided to send him out of Honduras, Celvyn had become a prisoner in his own home, unable to go outside or attend school for fear of further violence. That he was merely eleven at the time only heightens the conclusion that this boy suffered tremendous persecution for imputed beliefs that, quite tragically, he did not even understand.
Further, Celvyn’s claim easily meets the requirement that the harm be the direct result of “government action, government-supported action, or government’s unwillingness or inability to control private conduct.” Nikijuluw, 427 F.3d at 121. The record evidence shows that the local police and government were strongly supportive of the land-owning elite who persecuted Celvyn’s family for decades, and that Celvyn’s step-grandfather’s murder was carried out by government soldiers. Moreover, the family reported the 1996 murder of Celvyn’s uncle, but the authorities took no steps to arrest the perpetrator. The 1999 Country Report confirmed the existence of large-scale, land-owner vigilante groups in Olancho that apparently operated with impunity. All these facts led the family to reasonably conclude that the authorities had not in the past and would not in the future protect them.[29]
2. Well-Founded Fear of Future Persecution
Because in my view Celvyn has established that the evidence compels the con *91 elusion that he suffered past persecution on account of imputed political opinion, he is entitled to the presumption that he has a well-founded fear of future persecution. That presumption can only be rebutted by a showing, by a preponderance, that changed circumstances have rendered the fear of future persecution moot or that by relocating to another part of the country the applicant can avoid future persecution. See 8 CFR § 1208.13(b)(l)(i). Only the second showing is at issue here.
The legal standard on relocation is not a hypothetical one, but one rooted in the realities of the applicant’s situation and the extant country conditions. The regulations provide that the presumption of a well-founded fear is rebutted if “[t]he applicant could avoid future persecution by relocating to another part of the applicant’s country of nationality ... and under all the circumstances, it would be reasonable to expect the applicant to do so.” 8 CFR 208.13(b)(i)(B) (emphasis added). In Celvyn’s case, such a conclusion is simply not reasonable.
Celvyn is still a child. If he returns to Honduras he has only two family members with whom he could conceivably live, his grandmother and his father. It is unreasonable to expect Celvyn to relocate with his father because, as discussed above, he has never eared for Celvyn, and there is no reason to believe he would today. It is equally unreasonable to expect his elderly, ill grandmother to relocate with Celvyn to another part of the country. Given that he has no other means, if Celvyn cannot live with either of these adults, it is almost a foregone conclusion that he would live on the street somewhere in Honduras. Further, the record is clear about the tremendous problems facing street children in Honduras, including persecution by the police.
3. Humanitarian Exceptions
However, even if relocation were found to be reasonable, I believe Celvyn qualifies for humanitarian protection. Celvyn has both (a) demonstrated a compelling reason for being unwilling or unable to return to his country arising out of the severity of the past persecution, and (2) has established a reasonable possibility that he may suffer other serious harm upon removal to Honduras. See 8 CFR § 1208.13(b)(1)(iii); see also In re Matter of Chen, 20 I. & N. Dec. 16, 19 (BIA 1989); Lal v. I.N.S., 255 F.3d 998, 1009 (9th Cir.2001) (“The Matter of Chen exception is an expression of humanitarian considerations that sometimes past persecution is so horrific that the march of time and the ebb and flow of political tides cannot efface the fear in the mind of the persecuted.”); Sheriff v. Att’y Gen., 587 F.3d 584, 593 n. 6 (3d Cir.2009) (noting that Matter of Chen involved persecution of an eight-year-old boy on account of his father’s religious activities).
As for the first ground, Celvyn is a child who suffers post traumatic stress disorder caused by the extreme violence he experienced in Honduras, and his family lives in the United States. He has presented a compelling reason, rooted in the severity of the past persecution, not to be returned to Honduras. As to the second ground, Celvyn has demonstrated a reasonable possibility that he would suffer other serious harm were he returned to Honduras because he would likely live alone on the streets of Honduras, subject to well-documented abuses and gang recruitment. His mental illness and lack of family would make him especially vulnerable. In sum, even if the presumption of a well-founded fear were rebutted, Celvyn’s case is just the type for which these humanitarian exceptions were created.
*92 III. Conclusion
In this case, the IJ and BIA failed to issue a merits decision on the claim put forth by Celvyn, which requires, at minimum, a remand. In addition, on the merits, the IJ, the BIA, and the majority have discounted the vast majority of Celvyn’s supporting evidence, limiting themselves to the simple oral testimony of a child of thirteen recounting events that occurred when he was between five and eleven years of age. Because Celvyn’s claim is based on imputed political opinion due to his family’s political activism, a review of his family history was necessary. It was incumbent on this court, and those below, to examine the record as a whole to understand the factual basis of his claim. Of course, we are required to review the entire record in all eases, but that is particularly true in a case involving a minor.
When all is said and done, the majority essentially relies on our standard of review in order to affirm the decisions below. The argument is basically that our hands are tied, regardless of how unfortunate this young child’s experiences may have been. However, if this is not a case where we can reverse a denial of asylum, I have trouble imagining the set of facts that would permit such a reversal. In my view, this court has allowed the standard of review in asylum cases to become an ever more impermeable barrier to any meaningful appellate review.[30] Quoting from Judge Carnes on the Eleventh Circuit:
The majority opinion refers to the often-mentioned, but never sighted, “rare case” in which the facts are so compelling that we will reverse an immigration judge’s finding that a petitioner has failed to prove persecution on a protected ground---- [Tjoday’s decision indicates that such a case, like the fabled unicorn, exists only in our imagination.
Silva v. U.S. Att’y Gen., 448 F.3d 1229, 1248-49 (11th Cir.2006) (Carnes, J., dissenting). I therefore dissent.
APPENDIX
DECISION OF THE IMMIGRATION JUDGE
3. Past Persecution
The events as recounted by the Respondent do not establish that he was persecuted in the past. The Respondent testified that “Hubert,” his former neighbor in Honduras, destroyed his grandmother’s home and windows with a machete, frequently called him a “Communist,” threw stones at him, and on one occasion, hit him in the leg with a machete. The Respondent also testified that he had difficulties with “Maras,” gangs of fifteen year old boys from the neighboring village, when they pushed him and attempted to steal his money. At one point, these boys also *93 threw the Respondent from a small house, causing him to become entangled in a wire.
Behaviors that an adult may not typically associate with persecution or serious harm may produce lasting damage or physical or psychological trauma in a child and thus constitute persecution. See Civil v. INS, 140 F.3d 52, 62-63 (1st Cir.1998) (dissenting opinion). However, after a careful review of the Record of Proceedings (and bearing in mind the Respondent’s age at the time these events occurred), the Court concludes that the Respondent did not suffer from past persecution. While these events were, without a doubt, troubling, they amount to no more than a series of isolated altercations with a disgruntled neighbor and with a group of boys who bullied younger children into providing them with money. See Awad, 463 F.3d at 76 (harassment and bullying does not amount to persecution). There is no evidence in the Record of Proceedings that the Respondent was ever physically punished for possessing a belief or characteristic that others sought to overcome. Nor is there any evidence that encounters with “Hubert” or the “Maras” — and not, perhaps, the difficulties involved in traveling unaccompanied to the United States — caused the Respondent such lasting psychological trauma so as to rise to the level of past persecution. Cf Exhibit 6 (psychological evaluation diagnosing the Respondent with Post-Traumatic Stress Disorder). Accordingly, this Court finds that the Respondent did not suffer past persecution.

. Though the majority, the BIA, and the IJ refer to petitioner as Selvin Mejilla-Romero, the petitioner’s name is Celvyn Azael Mejia Romero. Apparently the incorrect name originated with a data entry error in his original Notice to Appear and was never corrected by the government despite notice of the problem.

. The Immigration and National Act (INA) defines a "child” as an unmarried person under twenty-one years of age, meaning Celvyn, who is now eighteen, still qualifies as such. See INA §§ 101(b)(1) and 101(c)(1), 8 U.S.C. § 1101(b)(1) and (c)(1).

. The majority's citation to Raza v. Gonzales, 484 F.3d 125 (1st Cir.2007), supports my view. We have required that the BIA, at a minimum, frame "its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion.” Id. at 128. Here, the BIA and the IJ have so completely misstated the factual basis of Celvyn's claim that it is plain that the agency has not adequately thought about the evidence and therefore could not have reached a reasoned conclusion.

. Because this is such an important point of disagreement with the majority, I have appended to my dissent the IJ’s complete analysis of Celvyn’s past persecution claim, which can be found on pages 17 and 18 of the IJ’s opinion, under the heading “Past Persecution.” Despite the majority's attempt to paper over the IJ’s failure to review Celvyn's claim, the appended portion plainly does not include a review of Celvyn’s claim or his supporting evidence. It is simply not there.

. The doctor’s evaluation is the only evidence in the record pertaining to Celvyn’s mental health. Nonetheless, the IJ dismissed the doctor’s conclusion as to the cause of Celvyn’s PTSD based on pure speculation. The IJ mused that there was no evidence in the record that Celvyn’s PTSD was caused by the "encounters" with the neighbors and the gang members rather than “perhaps, the difficulties involved in traveling unaccompanied to the United States.” In other words, the IJ dismissed the expert’s uncontested causal diagnosis of Celvyn’s PTSD based on nothing more than the IJ’s own personal guess that perhaps Celvyn’s trauma might have been caused by his travel to the United States. The majority, in turn, adopts the IJ’s speculative stance on this issue in spite of the uncontested record evidence identifying the source of Celvyn’s PTSD. The majority's acrobatic attempts to get around the clear and uncontested findings of the medical professional violate our case law and are surprising. See Cordero-Trejo, 40 F.3d at 487 (deference to BIA “is not due where findings and conclusions are based on ... merely personal views of the immigration judge”) (citations omitted). A simple reading of the psychological report leaves no doubt that Celvyn’s PTSD was caused by the extreme violence he experienced in Honduras at such a young age.

. An in-depth report from Harvard University on minors seeking asylum in the United States provides anecdotal examples of this difficulty:
For children, presenting their own evidence can be difficult. One asylum officer recounted a compelling case involving a 10-year-old girl whose father worked for a corrupt politician. Because the father knew compromising information about the politician, both parents were assassinated while the father was still employed by this politician. During her asylum interview, the orphaned girl focused primarily on the computer that her father would bring home from work rather than on the political context that had destroyed the family. Fortunately, news accounts of the parents’ assassination — supplied by supportive adults who realized their relevance — existed to corroborate and fill out the child's story. In another case, a Quality Assurance and Training Officer recalled that a child was asked “Why did they kill your uncle?” The child responded, "To make my grandmother sad.” Though children may be eligible for asylum, providing the evidence to support the claim may be impossible. As another asylum officer commented on the challenge of relying on children’s memory, "A lot of what sticks isn’t what we need.”
"Seeking Asylum Alone in the United States,” J. Bhabha & S. Schmidt, June 2006, available at www.humanrights.harvard.edu/images/ pd£_files/Seeking_Asylum_ Alone_US_Report.pdf.

. In his analysis of the past persecution issue, the IJ stated that he considered the fact that children may experience persecution in ways that are different from adults. Flowever, the IJ’s supposed consideration of Celvyn’s age was meaningless given that the IJ did not address Celvyn's imputed persecution claim, only drew upon the child’s oral testimony, and ignored the extensive evidentiary support *85 for his claim. In effect, despite Celvyn's age, the IJ required him to carry his asylum burden through his oral testimony alone. It should not be enough, as the majority apparently believes, for the IJ to merely state he has taken age into account. Where the written decision plainly shows that the IJ neither considered the child applicant's imputed political opinion claim nor considered his extensive supporting evidence, accepting at face value the IJ's assurance that he has factored in age amounts to placing form over substance. I would require that the IJ demonstrate through his analysis that this factor was taken into account. There is a big difference between these two. Using magic words should not be enough.

. For example, relating one of his neighbor’s violent machete attacks against himself and his elderly grandmother, Celvyn’s story-telling was very simple:
Q: Did he ever harm you?
A: Yes.
Q: What kind of things did he do to you?
A: One, once, this day, I was running because he was hitting me and he threw a machete at me.
Q: And what happened when he threw the machete at you?
A: He hit me here.
A: He grabbed the machete and he threw it against me and the machete ends up, ended up this way.

. For example, during cross-examination, Celvyn tried to explain why almost all of his family members had fled Honduras. He clearly understood that there was something systematic about the violence inflicted on his family, but his explanation of the larger context is limited by his age and development:
Q: Okay. And did your grandmother tell you why your mom and father came to the United States?
A: They went through the same thing I went through. Before, when she was in Honduras, also the family, the boys, the neighbor, they would bother our family and that's the reason all of them, almost all of them came here.
Q: Okay. Who told you that?
A: My mother. She knows that. She told me that.
A: When I told her what happened to me, she told me the same thing happened to me.

.Again on cross-examination, the government attorney probed the "on-account-of” element of the asylum standard. Celvyn knew that his neighbors called him and his family "Communists” but, in a textbook example of what constitutes a purely imputed political opinion, he stated that he did not even know what that word meant:
Q: Okay. And do you know why Hubert didn't like your grandmother?
A: No.
Q: Do you know why he said Communists?
A: I don't know what that word means.
Q: Okay. And did you hear it yourself or did someone tell you that's what he said?
A: He stated Communists.
Q: And you don't know what he meant by that?
A: No.

. As to the aunt's testimony, the IJ properly took into account that the aunt failed to appear for cross-examination after her initial testimony was taken. It is worth noting, however, that her testimony as to the family's long-running political activism with Lincol and the Liberal Party and the resulting violence was consistent with Celvyn’s testimony, Celvyn’s mother's testimony, and the extensive supporting evidence submitted in the case.

. The majority also concludes, without citation to the record, that the IJ and BIA "implicitly rejected those portions of MejillaRomero’s mother’s and aunt's narratives that indicated Hubert’s actions toward petitioner" were part of a broader political dispute. This is simply not true and the majority can cite to nothing in the record so suggesting. What the IJ and BIA did was fail to consider the claim Celvyn actually put forth or review the record as a whole regarding his claim. The IJ found that the mother’s testimony was generally consistent and reliable regarding the heart of Celvyn's claim, yet her testimony was not considered. Further, the record is otherwise replete with explanations of the broader political context of the family's persecution, including Celvyn’s testimony and the extensive supporting documentation presented by Celvyn. Yet neither the IJ nor the BIA drew on any of this material evidence. In other words, the IJ and BIA did not "implicitly reject" this evidence; they simply ignored it in its entirety. Indeed, that is the crux of the problem in this case.

.I also note that the majority tries a second tactic to dismiss the mother’s testimony. It argues that the mother was "inconsistent” as to whether Lincol was the activist group with which the family was aligned, or whether it was the group persecuting the land activists. *88 The breadth and depth of the mother’s testimony and affidavit, the aunt's testimony and affidavit, and the significant supporting evidence from scholars and other affiants shows that the family members were active Lincol members and were persecuted on this ground. There were, however, a few times in the mother’s oral testimony where her answers were translated so as to suggest that the family was persecuted by Lincol, rather than because of membership in Lincol. However, Celvyn's attorney objected on the record several limes to just this translation. As his lawyer explained, in Spanish the word "por” means both “by” and "because of.” Any inconsistencies in the mother’s testimony were the result of a translation error to which Celvyn’s attorney objected. The majority ought not rely on a few instances of objected-to translation errors as a basis for dismissing the mother's testimony, particularly where the asylum applicant is a minor and cannot himself adequately explain why he was harmed.

. The government waived its right to cross-examine Dr. Radan, leaving her affidavit uncontested in the record.

. The government also waived cross-examination as to this affiant, leaving her affidavit uncontested in the record.

. Celvyn made a written motion to allow telephonic testimony from Professor Bonta. It appears from the record that the IJ never decided the motion.

. The government waived cross-examination as to this affiant as well.

. The IJ does list all of the exhibits entered into evidence, and briefly mentions that the supporting evidence "bolster[s] the credibility of [Celvyn's] testimony.” But the IJ does not discuss the content of the evidence as it relates to the factual basis of Celvyn's past persecution claim, as the appended portion of the IJ's decision shows.

. For example, the majority dismisses the relevance of Celvyn’s affidavit because Celvyn “did not mention these events in his subsequent testimony before the IJ and indeed testified that he did not know why Hubert threw stones at him or did not like his grandmother.” (emphasis added). Here, again, the majority takes Celvyn's inherent disability, namely his age-related difficulty in explaining orally the trauma he endured and the political reasons for it, and uses that as an excuse to dismiss other forms of evidence, rather than as a reason to give particular care and consideration to his supporting forms of proof. In other words, the majority uses Celvyn's disability to exclude rather than include additional evidence, which turns the rule governing the consideration of juvenile asylum applications on its head.

. The majority's assertion that Celvyn did not "present any evidence that the Honduran government was unwilling to prosecute his assailants,” is not supported by a review of the record as a whole. In addition, where there is evidence, as in this case, that the governing authorities are complicit in the persecution and have failed to provide protection in the past, there is no requirement that the applicant have reported further incidents of harm to those very same authorities. See, e.g., In re S-A-, 22 I & N Dec. 1328, 1335 (BIA 2000) ("[T]he evidence convinces us that even if the respondent had turned to the government for help, Moroccan authorities would have been unable or unwilling to control her father's conduct.”). Indeed, a reporting requirement would exclude many of the most deserving asylum applications because it is common sense not to report persecution to government officials who one has reason to believe are cooperating with the persecutors.

. It is instructive to review data from the Department of Justice, Executive Office for Immigration Review, which shows that this circuit is among the least likely to reverse a decision of the BIA. For example, in 2006, the average reversal rate for all circuits was 17.5%, while the First Circuit reversed in just 7.1% of cases, making it the third least likely circuit to reverse. See http://www.justice.gov/ eoir/vll/ILA-Newsleter/ILA%20Vol%202/vol2n ol.pdf. In 2007, the average reversal rate for all circuits was 15.3%, while the First Circuit reversed in only 3.8% of cases, placing it dead last. Id. In 2008, the average reversal rate for all circuits was 12.6%, while the First Circuit reversed in just 4.2% of cases, placing it second from the bottom. See http://www.justice. gov/eoir/vll/ILA-Newsleter/ILA%202009/vol3 nol. pdf. For the first ten months of 2009, the average reversal rate was 11.5%, while the First Circuit reversed in 4.8% of cases, making it the fourth least likely circuit to reverse. See http://www.justice.gov/eoir/ vll/ ILA-Newsleter/ILA2009/vol3 noil. pdf.