# United States Court of Appeals
## For the First Circuit

No. 19-1620

CRISTIAN JOSUE DIAZ ORTIZ,

Petitioner,

v.

WILLIAM P. BARR,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Howard, Chief Judge,
Lynch and Lipez, Circuit Judges.

Kristin M. Beale, with whom Ellen Scordino, Gemma Seidita, and Cooley LLP were on brief, for petitioner.
Timothy Bo Stanton, Trial Attorney, Office of Immigration Litigation, with whom Joseph H. Hunt, Assistant Attorney General, Civil Division, and Paul Fiorino, Senior Litigation Counsel, were on brief, for respondent.

May 15, 2020

**LYNCH**, **Circuit Judge**.  Cristian Josue Diaz Ortiz, a native of El Salvador, seeks review of a Board of Immigration Appeals (BIA) decision affirming an Immigration Judge's (IJ) denial of his claims for asylum, withholding of removal, and protection under Article 3 of the United Nations Convention Against Torture (CAT).  See 8 U.S.C. §§ 1158, 1231(b)(3); Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (1998).

The IJ found that Diaz Ortiz did not meet his burden to show eligibility for any of the grounds for relief he sought and ordered Diaz Ortiz removed.  The IJ found that Diaz Ortiz was not credible and gave several reasons, including inconsistencies in his testimony and contradiction of his testimony through other evidence.

This lack of credibility finding was based in part on field reports, gathered by Boston-area law enforcement and summarized in a government database, that concerned Diaz Ortiz's association with alleged MS-13 gang members and contradicted aspects of his testimony.  In part, the finding was also based on an inconsistency in his testimony.  That inconsistency undercut his attempt to give an innocent reason to his possession of a padlock and chain, which the government says are weapons used by MS-13 gang members.  His response to the IJ's request that he explain the inconsistency was itself not credible.  The IJ noted a lack of corroborative evidence.

The BIA affirmed the IJ's decision in a careful opinion. After this court denied a stay of removal, Diaz Ortiz was removed. The parties agree the petition is not moot. See Leitao v. Reno, 311 F.3d 453, 456 (1st Cir. 2002).

Diaz Ortiz argues that the IJ's adverse credibility determination was not supported by substantial evidence. He argues that introduction of law enforcement gang database records violated his due process rights, and that his testimony was not inconsistent. From this, he argues that the finding that he had not met his burden was error. He also argues that the IJ applied the wrong legal standard to his withholding of removal and CAT claims. Because all of these arguments lack merit, we deny his petition for review.

I.

On July 21, 2015, Diaz Ortiz, then sixteen years old, entered the United States near Rio Grande City, Texas. Immigration officials quickly arrested him, initiated removal proceedings against him, and released him into the custody of his uncle, who lived in East Boston, an area within the City of Boston. Diaz Ortiz started living in East Boston in August 2015.

Throughout 2017 and 2018, while Diaz Ortiz lived in East Boston, he had eleven interactions with law enforcement that were documented in field reports gathered by the Boston Police Department and the Boston School Police Department and compiled by

- 3 -

the Boston Regional Intelligence Center ("BRIC") in the BRIC Gang Assessment Database. The interactions included four occasions between March 2017 and May 2018 of police finding Diaz Ortiz with marijuana, both alone and with others; four occasions between September 2017 and June 2018 of police observing Diaz Ortiz with people identified as members of the MS-13 gang, including one member for whom police had information there was an active arrest warrant; one occasion on June 1, 2018, of police observing Diaz Ortiz outside a "known hangout" for MS-13 members; one occasion on June 21, 2018, of police observing Diaz Ortiz trespassing with four others; and one occasion on August 1, 2018, when Diaz Ortiz was with two others identified as MS-13 gang members and, on questioning, told officers he had a metal chain and pad lock for his bicycle in his bag, though he had no bicycle with him. The government asserts that MS-13 gang members frequently use a metal chain and lock as a weapon. Police seized the items. The observations included that Diaz Ortiz frequented areas known for MS-13 gang activity.

On August 20, 2018, Homeland Security Investigations ("HSI") and Enforcement and Removal Operations ("ERO") arrested Diaz Ortiz in East Boston along with two MS-13 gang members as part of an MS-13 gang arrest operation. On August 21, 2018, because of Diaz Ortiz's earlier law enforcement interactions, HSI labeled Diaz Ortiz "a VERIFIED and ACTIVE member of the MS-13 gang

- 4 -

in the Boston metro area."  After his arrest, Immigration and Customs Enforcement ("ICE") detained Diaz Ortiz under 8 U.S.C. § 1226(a), which provides that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."[1]

On October 1, 2018, Diaz Ortiz filed an application for asylum, withholding of removal, and CAT protection.  He alleged that in El Salvador in 2015 the MS-13 gang had attacked him and threatened his life because he was a practicing evangelical Christian and that he feared the gang would kill him if he returned to El Salvador.

On December 4, 2018, at the merits hearing on his asylum application, Diaz Ortiz testified with an interpreter's help as follows.  He is an evangelical Christian, attended church "three or four times a week" while in El Salvador, but only a few times

---

[1]    On December 18, 2018, Diaz Ortiz filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the District of Massachusetts.  He argued that his detention was unlawful because the government improperly placed the burden on him to prove that he was eligible for release on bond.  On January 29, 2019, the court granted the writ and ordered the government to hold a second custody redetermination hearing at which that burden was placed on the government.  Diaz Ortiz v. Tompkins, No. 18-12600-PBS, 2019 U.S. Dist. LEXIS 14155, at *5 (D. Mass. Jan. 29, 2019).  At Diaz Ortiz's second hearing, a different immigration judge again declined to release him.  See Diaz Ortiz v. Smith, 384 F. Supp. 3d 140, 142 (D. Mass. 2019).  Diaz Ortiz then moved to enforce the district court's earlier order, arguing that his second hearing was also flawed, but the court denied that motion.  Id. at 145.

while in the United States, and he served in El Salvador as a "youth leader" in his faith. In El Salvador, MS-13 gang members often approached him on his way to school to ask him to join the gang, and he refused. On one occasion in 2015, gang members beat him, robbed him, and threatened to kill him if he did not leave his Christian beliefs to join the gang. He did not produce medical records of any injury. Diaz Ortiz also testified that a person cannot be both an evangelical Christian and a member of MS-13, that he would not join a gang, and that he was opposed to gangs because of his faith.

Diaz Ortiz also testified MS-13 gang members murdered his aunt in El Salvador. He said he feared that MS-13 gang members would kill him if he returned to El Salvador.

When asked about his time in Boston, Diaz Ortiz testified that he had attended church in Boston "a few times" but not very often. When the IJ asked him what his method of transportation in Boston was, Diaz Ortiz responded that he took the train. The IJ clarified: "Always?" Diaz Ortiz responded: "Yes. Well, when I lived in, in my house where I lived in, in East Boston, I didn't because it was close, but when I lived in Boston, I, I had to use the train." The IJ asked again: "So, you never traveled anywhere except by train, correct?" Diaz Ortiz responded: "Yes, yes, only in train."

The government later asked Diaz Ortiz about the occasion, after he had been frequently seen with MS-13 members, on which the police found a metal chain and pad lock on him while he was with two gang members (and no bicycle). He was asked: "And you told the officer that it was a chain and lock that you use for your bicycle." Diaz Ortiz responded: "Yes, several times they stopped me." The government then asked: "Why did you tell the police that you had the chain and the padlock for a bicycle, yet you told the Court today that you only traveled around by train?" Diaz Ortiz responded: "Well, when I lived in East Boston, of course, I had the bicycle there to go around and, and do things around there, but when I lived in Boston and I took the train, I couldn't bring the bike anymore."

On cross-examination of Diaz Ortiz, the government sought to introduce the field reports from the BRIC Gang Assessment Database, described earlier. Diaz Ortiz objected through counsel, arguing that the evidence was "not reliable and fundamentally unfair." He argued that the reports contained mistakes and inconsistencies and did not comply with 28 C.F.R. Part 23. He did not ask that the officers who summarized the data or the officers who made the observations be called to testify or be made available for cross-examination. The IJ overruled the objection.

As to the evidence from the BRIC Gang Assessment Database of his five interactions with MS-13 members in Boston over the

period from March 2017 to August 2018, Diaz Ortiz testified that he did not know that the other people he was with were MS-13 members or that the areas he had been in were known for gang activity, but he did not otherwise contest the observations as inaccurate.

An expert on conditions in El Salvador also testified at the hearing for Diaz Ortiz, saying that MS-13 members in El Salvador target evangelical Christians because the gang views them as competition for recruitment. Diaz Ortiz supplemented his asylum application with supporting documentation, including a personal declaration; declarations from his mother and his pastor in El Salvador; his aunt's death certificate; an affidavit from Thomas Nolan, a Boston University professor who criticized the reliability of the information in the BRIC Gang Assessment Database about Diaz Ortiz's interactions with gang members; and others. Diaz Ortiz also submitted further briefing about the BRIC Gang Assessment Database evidence, arguing that the IJ should "give minimal weight" to the reports because they were "uncorroborated hearsay" and that many of the behaviors described in the reports are "innocuous."

On December 19, 2018, the IJ denied Diaz Ortiz's application in a written nine-page opinion. As to the finding that Diaz Ortiz was not credible, the IJ found that his claim that he was not an MS-13 gang member was contradicted by "the plethora

of evidence . . . in the record" about his associations with MS-13 gang members.  The IJ highlighted Diaz Ortiz's testimony that the lock and chain were for his bicycle, noting that Diaz Ortiz had said he only used the train for transportation and did not ever mention using a bicycle.  On that point, the IJ concluded that he was "unpersuaded by [Diaz Ortiz's] explanation" for the discrepancy.  The IJ stated: "Given the significant evidence that [Diaz Ortiz] is a MS-13 gang member, the Court casts great doubt on whether [Diaz Ortiz] is actually an evangelical Christian," which was the basis of his asylum claim, but the IJ made no finding on this point.  The IJ also noted that he assigned Diaz Ortiz's supporting declarations from family members "limited weight as the authors are not present for cross-examination."

The IJ found that Diaz Ortiz had not established past persecution based on a protected ground or proven that he had a well-founded fear of future persecution based on a protected ground.  The IJ also stated as a matter of its discretion:

> Even if [Diaz Ortiz] was statutorily eligible for asylum, . . . the Court would deny his application as a matter of discretion.  8 C.F.R. § 1208.14(a).  DHS has filed numerous documents stating that [Diaz Ortiz] is affiliated with a gang or a member of such. He has been stopped by the police several times, and on at least one occasion, he was found with a lock and chain, a weapon frequently used by local gang members.  His gang affiliations are also well-documented by local law enforcement agencies.  Because gang affiliation is an incredibly dangerous factor,

> the Court finds that it is a serious negative
> inequity that is not offset by [Diaz Ortiz's]
> limited positive equities.

Finally, the IJ found that Diaz Ortiz had not established that it was more likely than not that he would be tortured in El Salvador by or with the acquiescence of a government official.

Diaz Ortiz appealed the IJ's decision to the BIA, arguing that the IJ's credibility finding was clearly erroneous because it was not based on the record as a whole and mischaracterized Diaz Ortiz's testimony. He also argued that the IJ's reliance on the police documentation in the BRIC Gang Assessment Database of his interactions with gang members was fundamentally unfair and violated his due process rights. He argued that the reports contained "numerous indications of [their] lack of reliability and trustworthiness." He referred to Prof. Nolan's affidavit, which argued that the database did not comply with 28 C.F.R. Part 23 and that none of its entries provided evidence of reasonable suspicion of criminal activity. He did not argue that the events documented in the database did not occur. From this, Diaz Ortiz argued that the IJ's conclusion that he was not entitled to asylum was error.

The BIA dismissed Diaz Ortiz's appeal on June 5, 2019. Its decision found that the IJ's credibility finding was not clearly erroneous given the contradictions in Diaz Ortiz's testimony and the contradictions between his testimony and the BRIC Gang Assessment Database evidence. The BIA stated:

- 10 -

When pressed, [Diaz Ortiz] explained that he was not a gang member, and he did not know that the people he associated with were gang members or that the areas they spent time in together were frequented by the gang. He also explained that the lock and chain found on his person were for his bike. The [IJ] did not find these explanations to be reasonable. [Diaz Ortiz] had multiple contacts with law enforcement when he associated with known gang members in areas frequented by the gang, and [Diaz Ortiz] admitted that he previously testified that he "did not use any other means of transportation other than a train" in Boston. Considering the totality of the circumstances, we will affirm the [IJ's] adverse credibility finding because it is not clearly erroneous.

(footnotes and citations omitted). The BIA also held that, even if Diaz Ortiz's explanations were plausible, the IJ's conclusions were also plausible and so could not be clearly erroneous.

The BIA found Diaz Ortiz's objection to the BRIC Gang Assessment Database evidence was "not borne out by the record" because the "reports consistently indicate that [Diaz Ortiz] associated with known MS-13 gang members in areas of Boston frequented by the gang and carried gang-related weapons." The BIA also explained its rejection of Prof. Nolan's criticism of the gang evidence, stating:

[T]he professor does not explain why [Diaz Ortiz's] associations with known MS-13 gang members in areas frequented by the gang, along with the fact that gang-related weapons were found on his person, do not give rise to a reasonable suspicion. Significantly, counsel has not presented evidence that [Diaz Ortiz]

- 11 -

has been removed from the Boston police's database because his inclusion was unlawful.

(citation omitted).

The BIA also held that, to the extent that Diaz Ortiz's supporting materials were consistent with his testimony, those materials still failed to rehabilitate the inconsistencies in his testimony. It analyzed each declaration in turn, stating:

> [Diaz Ortiz's] declaration, which claims that he could not join MS-13 because he is a Christian, is not consistent with other evidence in the record. In addition, although the affidavit from [Diaz Ortiz's] pastor states that the respondent left El Salvador "to escape the gangs' threats and attempts to recruit him," it does not corroborate in any detail [Diaz Ortiz's] testimony that he was physically assaulted by MS-13. The aunt's death certificate and evidence that [Diaz Ortiz] once participated in Christian activities and distributed religious literature with his family and church also do not corroborate that [Diaz Ortiz] was beaten or threatened by members of MS-13 in El Salvador. [Diaz Ortiz] conceded that he does not appear in the undated photographs in the record, which he claims depict his family's Christian bookstore in El Salvador. Finally, although the affidavit from [Diaz Ortiz's] mother states that [he] was "attacked" by the gangs because he was going to church, we agree with the [IJ] that this evidence, which is from an interested person, is insufficient to rehabilitate [Diaz Ortiz's] testimony.

(citations omitted). The BIA affirmed the IJ's finding that the record did not establish that Diaz Ortiz would be tortured in El Salvador, noting that "the single beating [Diaz Ortiz] allegedly

experienced in El Salvador . . . did not require medical attention."

                              II.

        "We must uphold the BIA's decision 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Silva v. Gonzales, 463 F.3d 68, 72 (1st Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review "[f]actual findings, including credibility determinations . . . under the familiar substantial evidence standard." Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir. 2009). "In other words, findings of fact will stand as long as they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Jianli Chen v. Holder, 703 F.3d 17, 21 (1st Cir. 2012) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). Where, as here, "the BIA adopts and affirms the IJ's ruling but also examines some of the IJ's conclusions, this Court reviews both the BIA's and IJ's opinions." Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012) (citing Matovu v. Holder, 577 F.3d 383, 386 (1st Cir. 2009)).

        To be eligible for asylum, an applicant must show "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). An applicant's testimony alone can meet this burden, but if the agency

                            - 13 -

finds that the testimony is not truthful, "that determination strips the testimony of probative force and permits the agency to . . . discount it."  Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007).  The REAL ID Act permits the IJ to consider inconsistencies in an applicant's statements "without regard to whether an inconsistency . . . goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii).

Diaz Ortiz argues that the adverse credibility determination was based on a single inconsistency that was not, in fact, inconsistent, and that the use of the BRIC Gang Assessment Database evidence violated his due process rights.  From this, he asserts the adverse credibility finding is unsupported.  He is wrong for several reasons.  We first note that the IJ was permitted to disbelieve Diaz Ortiz's testimony about his modes of transport and the padlock and chain.  We then affirm the BIA's conclusion that the admission of the BRIC Gang Assessment Database evidence was not an error and most certainly not a due process violation.

Diaz Ortiz argues the lack of credibility finding turned on the inconsistency in his explanation for why he had in his possession a metal chain and pad lock, known MS-13 weapons, while he was observed with MS-13 members and he had no bicycle with him. Diaz-Ortiz argues his statements were not inconsistent.[2]  As the

_____

[2]    Although Diaz Ortiz also argues that the IJ did not "provide[] an opportunity to explain the perceived inconsistence,"

- 14 -

BIA held, the IJ was not compelled to find Diaz Ortiz's statements were not inconsistent.  Given that both of the indicia used by each of the IJ and the BIA as to lack of credibility were properly considered, we do not reach the government's argument that the metal chain and pad lock inconsistency alone supports the IJ's lack of credibility finding.

Diaz Ortiz next argues that the BRIC Gang Assessment Database evidence was collected in violation of 28 C.F.R. Part 23, which requires that an interjurisdictional intelligence system like BRIC

> shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity.

28 C.F.R. § 23.20(a).  He argues that the field reports offered at his asylum hearing do not support reasonable suspicion of criminal activity.  Diaz Ortiz further points to minor inconsistencies in the field reports.  He argues that it was "unclear" that each field report was created by a person with authority to submit reports to the database.

---

this claim is not supported by the record.  He was asked about the inconsistency.  Diaz Ortiz's counsel was free to return to the topic on redirect and did in fact ask him why he had a bike lock but not a bicycle.  Diaz Ortiz explained that a friend had asked to borrow his bicycle and that police had previously seen him with the lock and chain while he also had his bicycle with him.

- 15 -

We reject Diaz Ortiz's challenge to the BIA's upholding of the admission of the BRIC Gang Assessment Database evidence, under any standard of review.  Diaz Ortiz did not argue to the IJ the information in the field reports was not accurate, or that the persons he was seen with were not in fact MS-13 members.  Rather, he denied knowledge that the other people seen with him were MS-13 members, but produced no evidence to support that testimony.[3] He also did not ask that the government produce testimony to support the assertions in the database that the other people he was observed with were MS-13 members.

Further, we agree with the BIA's conclusion that there was no violation of 28 C.F.R. Part 23.[4]  The regulations set forth requirements for federal funding for certain state and local law enforcement operations, including criminal intelligence systems. See 28 C.F.R. § 23.3 ("These policy standards are applicable to all criminal intelligence systems operating through support under the Omnibus Crime Control and Safe Streets Act of 1968 . . . ."); see also 34 U.S.C. § 10723 (authorizing federal grants for

_____

[3]     He also did not argue to the IJ that the officers whose reports appear in the evidence should have been required to appear at his hearing, either to authenticate the documents or to testify to their contents.

[4]     Prof. Nolan's declaration, which focuses on the database's compliance with 28 C.F.R. Part 23, does not challenge the basic facts of the interactions documented in the field reports.

"[p]rograms to assist State and local criminal justice agencies to develop, establish, and maintain intelligence-focused policing strategies and related information sharing"). The regulatory prohibition is meant to cabin the information contained in the database, at the risk of losing federal funding. See 28 C.F.R. § 23.40 (establishing "specialized monitoring and audit" to ensure state and local agencies' regulatory compliance). These regulations are not a rule about admissibility or an exclusionary rule. Diaz Ortiz at no time has offered any authority that prohibits the use in immigration proceedings of field reports gathered in a Part 23 database that does not comply with those regulations. Nor at any time has he offered any authority for the more general proposition that such police field reports are inadmissible in immigration proceedings.

Apart from these failings, the argument fails for another reason. "Strict rules of evidence do not apply in immigration proceedings," and "[i]t is normally enough if the IJ reasonably finds a proffered piece of evidence to be reliable and its use to be fundamentally fair." Jianli Chen, 703 F.3d at 23. As the BIA held, the IJ reasonably determined these reports were sufficiently reliable and there was nothing unfair in their admission.[5] The reports, which document Diaz Ortiz's increasingly

---

[5] Because the Federal Rules of Evidence do not apply in asylum proceedings, Yongo v. INS, 355 F.3d 27, 30 (1st Cir. 2004),

frequent associations with MS-13 gang members, leading to the discovery by police of his possession of a padlock and chain, were highly material to the claimed bases for his asylum eligibility. Given Diaz Ortiz's assertions in his testimony that he would never join a gang because of his religious beliefs, the field reports of his associations are clearly relevant to his credibility.

The dissent's attack on the BRIC Gang Assessment Database evidence is misleading and irrelevant. The IJ found that Diaz Ortiz's testimony lacked credibility because it contained contradictions. Among the contradictions was that Diaz Ortiz was carrying a bike chain and lock but was inconsistent about whether he used a bicycle for transportation. When found with the bike chain and lock, Diaz Ortiz was in the company of two MS-13 members. The dissent argues that the fact of Diaz Ortiz's possession of a bike chain and lock arose only from the BRIC Gang Assessment Database evidence, which it would reject as unreliable. But the dissent's basis for finding that evidence unreliable focuses on the means by which the database tracks and documents gang affiliations. These are irrelevant to and do not undermine the testimonial inconsistency. Diaz Ortiz never denied carrying a bike chain and lock or submitted any evidence to the contrary. We review an IJ's evidentiary decisions only for abuse of discretion.

we do not reach the question of whether these reports would have been admissible under those rules.

See Davis v. Lynch, 802 F.3d 168, 177 (1st Cir. 2015). It was not an abuse of discretion for the IJ to admit the evidence that Diaz Ortiz carried a bike chain and lock or to find Diaz Ortiz's testimony contradictory on that basis. Nor does the use of that evidence come anywhere close to a due process issue.

Because the dissent's further discussion of the BRIC Gang Assessment Database evidence is irrelevant to this finding, we do not address the merits of the dissent's objection to the database. It is irrelevant to the outcome of the case given the standards of review which govern this court. There is no need for us to engage in a response pointing out the many inaccuracies and weaknesses in the dissent's discussion and its resulting conclusion that any consideration of the database evidence by the IJ was a violation of due process.

Diaz Ortiz also argues that the BIA incorrectly concluded that the record evidence beyond Diaz Ortiz's testimony did not corroborate his asylum claim. Not so. The BIA specifically noted that Diaz Ortiz's declaration was "not consistent with other evidence in the record," namely the gang evidence. It also noted that each of Diaz Ortiz's other supporting materials was insufficient: the affidavit from Diaz Ortiz's pastor did not corroborate his persecution; his mother's affidavit had limited value because she was an interested party and because she did not testify; and his aunt's death certificate did not

- 19 -

demonstrate a threat to Diaz Ortiz himself.  These findings were supported by substantial evidence.  Because Diaz Ortiz has not met his burden for asylum, he cannot prevail on the higher burden for withholding of removal.  See Li Sheng Wu v. Holder, 737 F.3d 829, 832 & n.1 (1st Cir. 2013).

Finally, Diaz Ortiz argues that the BIA applied the wrong legal standards in its analysis of his CAT claim by adding a requirement that he would be tortured because of his faith.  Even if, dubitante, that were true, any such error would be harmless. The IJ found that Diaz Ortiz had "not adduced sufficient evidence to establish that, if he returned to El Salvador, it is more likely than not members of the Salvadoran government will engage, instigate, consent, or acquiesce, in his torture."  The BIA then held:

> We will likewise affirm the [IJ's] decision to deny [Diaz Ortiz's] application for [CAT] protection.  Upon de novo review, we conclude that the single beating he allegedly experienced in El Salvador, which did not require medical attention, along with the gang's alleged threats do not rise to the level of past torture. . . .  As noted, moreover, the documentary record does not independently establish that it is more likely than not that the respondent will be tortured in El Salvador by the gangs based on his Christian faith.  Finally, it has been approximately 5 years since he was allegedly harmed in El Salvador.

(citations omitted).  For these reasons, Diaz Ortiz's petition for
review is <u>denied</u>.

**-Dissenting Opinion Follows-**

**LIPEZ**, **Circuit Judge, dissenting.** At the core of the IJ's and BIA's rejection of Diaz's petition for relief is an adverse credibility determination based on a "Gang Assessment Database" so seriously flawed that reliance upon it by the IJ and BIA violated Diaz's due process rights. Hence, I would grant the petition for review and remand for new agency proceedings. I therefore respectfully dissent.

**I.**

The package of Gang Assessment Database documents introduced by the government at Diaz's merits hearing opens with a Department of Homeland Security (DHS) memorandum by HSI Special Agent Sean Connolly[6] featuring this provocative subject line: "Verified MS-13 Gang Affiliation of Cristian Josue DIAZ ORTIZ aka Christian DIAZ-ORTIZ." The memo goes on to state the following:

> On August 20, 2018, Cristian Josue DIAZ ORTIZ was arrested with two other MS-13 gang members by Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI)[7] as part of an MS-13 gang arrest operation in East Boston, Massachusetts.

---

[6] I will refer to the gang-related documents, i.e., the DHS memorandum and its supporting documents, collectively as the "gang package."

[7] ERO and HSI are both branches of Immigration and Customs Enforcement (ICE). Who We Are, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about (last updated Jan. 8, 2020). ERO "manages all aspects of the immigration enforcement process" and specifically "target[s] public safety threats," including "gang members," for "identification and arrest." Id. HSI investigates "cross-border criminal activity," including "transnational gang activity." Id.

- 22 -

Homeland Security Investigations Boston Intelligence has determined Cristian Josue DIAZ ORTIZ to be a Risk to Public Safety as a VERIFIED and ACTIVE member of the MS-13 gang in the Boston metro area.

The Mara Salvatrucha (MS-13) gang is a large transnational criminal organization with thousands of members and associates throughout the United States. The MS-13 gang is among the most violent transnational street gangs in the United States, specializing in crimes of violence including murder, attempted murder, violent armed assaults, firearms offenses, weapons related crimes, drug distribution, intimidation and robbery. In Massachusetts MS-13 operates in a number of communities including: Boston, Chelsea, East Boston, Somerville, Everett, Revere, Lynn and Nantucket.

1. Cristian Josue DIAZ ORTIZ has been verified as an MS-13 gang member by the Boston Police Department (BPD)/Boston Regional Intelligence Center (BRIC). (See the attached BPD/BRIC MS-13 Gang Member Verification: "CHRISTIAN DIAZ-ORTIZ".)

2. Cristian Josue DIAZ ORTIZ has documented associations with MS-13 gang members by the Boston Police Department and Boston School Police Department (BSPD). (See the attached BPD & BSPD incident/field interview reports and gang intelligence bulletins.)

3. Cristian Josue DIAZ ORTIZ has been documented carrying common MS-13 gang related weapons by the Boston Police Department (See the attached BPD incident/field interview reports.)

4. Cristian Josue DIAZ ORTIZ has been documented frequenting areas notorious for MS-13 gang activity by the Boston Police Department. These areas are 104 Bennington St. and the East Boston Airport Park/Stadium

in East Boston, Massachusetts which are both known for MS-13 gang activity including recent firearms arrests and a homicide. (See the attached BPD incident/field interview reports and MS-13 gang intelligence bulletins.)

This memorandum offers a damning portrayal of Diaz. His active participation in a vicious gang like MS-13 would rightfully doom any request for relief from removal. Hence, the reliability of the report labeling Diaz an active MS-13 gang member is critical to a fair proceeding. But the record reveals that the DHS documents relied upon by the IJ and BIA to determine that Diaz was a gang member are so unreliable that they do not support the provocative characterization of him in the gang package.

The Department of Homeland Security is the final link in a chain of reporting that begins with police officers in Boston conducting stops called "field interrogation observations" -- FIOs for short. FIOs are "interaction[s] in which a police officer identifies an individual and finds out that person's business for being in a particular area." Commonwealth v. Warren, 58 N.E.3d 333, 337 n.5 (Mass. 2016) (quoting Commonwealth v. Lyles, 905 N.E.2d 1106, 1108 n.6 (Mass. 2009)). These "consensual encounters" are considered "constitutionally insignificant, and a police officer may initiate such an encounter without any information indicating that the individual has been or is presently engaged in criminal activity." Commonwealth v. Narcisse, 927 N.E.2d 439, 443

(Mass. 2010).  The officer then documents the FIO.[8]  If the subject of the FIO is a suspected gang member, the officer submits the documentation to the Boston Regional Intelligence Center (BRIC) for entry into Boston's Gang Assessment Database.  See Rule 335 - Gang Assessment Database, Boston Police Department Rules and Procedures, 4 (March 23, 2017), https://bpdnews.com/rules-and-procedures (follow "RULE 335 - GANG ASSESSMENT DATABASE" hyperlink).  BRIC, which maintains the database, is "a unit of the Boston Police Department that gathers and analyzes intelligence." Shannon Dooling, Here's What We Know About Boston Police's Gang Database, WBUR News (July 26, 2019), https://www.wbur.org/news/ 2019/07/26/boston-police-gang-database-immigration.[9]  DHS and other agencies can then access the intelligence stored in the database.  See id.

---

[8] FIOs are documented in various ways.  Some FIOs are documented in actual police reports ("Field Interview Reports," as the Boston Police Department titles them), while others are described only in "gang intelligence bulletins," single-page documents that look like PowerPoint slides.  Each bulletin consists of a one-sentence description of an FIO, along with photos of the individuals who are the subject of the bulletin captioned with their names, addresses, and birth dates.

[9] The government did not provide the IJ with information about this chain of reporting when it submitted the gang package at Diaz's merits hearing, and I have therefore drawn this background from publicly available sources.  Diaz, however, did explain in a supplemental brief to the IJ that the Boston Police Department uses a point system to classify people as gang members, see infra, and emphasized that the system has been the subject of criticism.

The Boston Police Department uses a point system to identify suspected gang members. See Rule 335 - Gang Assessment Database, at 2-3. The Department has a non-exhaustive list of "conduct that could result in an individual's verification for entry into the Gang Assessment Database." Id. at 2. The conduct is assigned a point value. Id. at 3. For example, having a gang-related tattoo and being the victim of gang violence are each worth eight points. Id. Also included in the list is "Contact with Known Gang Member/Associate (FIO)," which is worth "2 points per interaction." Id. A person who accrues six points is labeled a gang associate, and a person who accrues ten points is deemed a gang member. Id. at 2.

BRIC generates a "Gang Member Verification Report" for individuals who have been entered into the database. Diaz's report identifies him as a primary, active, and "verified" member of MS-13 and indicates that he has accrued "21 points." All twenty-one points resulted from his contacts with "known" gang members or associates. The Gang Member Verification Report shows that sixteen of the points were assigned for eight instances of "Contact with Known Gang Members/Associates." The remaining five points were assigned for one incident, described in a Boston School Police "Intelligence Report," that is listed under "Information Developed During Investigation and/or Surveillance." The corresponding report, however, simply documents that Diaz was seen with young

- 26 -

men who were suspected MS-13 members.  It is unclear why he was assigned five points for that interaction, rather than two.

Thus, Diaz was assigned points for nine FIOs.  There are sixteen reports and bulletins involving Diaz in the Gang Assessment Database, but some FIOs are documented by both a police report and a gang intelligence bulletin.  There is, however, one Boston School Police bulletin in the database for which Diaz was not assigned any points.

These are the nine encounters for which Diaz was assigned points.

-— March 8, 2017 (2 points[10]): Diaz was smoking marijuana in an alleyway with another Hispanic teenager.[11]  Diaz also had a small amount of marijuana on his person, a civil offense in Massachusetts.  See Mass. Gen. Laws ch. 94C, § 32L (effective July 28, 2017).[12]

---

[10] This police report does not designate Diaz's companion as an "MS-13 Gang Member," as later reports do, but Diaz was nevertheless assigned points for the FIO.

[11] The Field Interview Reports identify the individuals with whom Diaz associated as Hispanic.  All references to individuals' ethnicities are drawn from the law enforcement documents being described.

[12] At that time, possession of one ounce or less of marijuana was a civil offense.  See Mass. Gen. Laws ch. 94C, § 32L (effective Dec. 4, 2008 to July 27, 2017).  The triggering amount increased to two ounces or less on July 28, 2017.  See Mass. Gen. Laws ch. 94C, § 32L (effective July 28, 2017).

—— <u>September 13, 2017</u> (2 points): Diaz was smoking marijuana on the front steps of a building with another Hispanic teenager, who is identified in the police report as a "known MS-13 gang member."

—— <u>November 28, 2017</u> (5 points): Boston School Police officers saw a student wearing a "full face mask" and spoke with the student, whom they identified as a member of MS-13. That student then walked up to a group of other teenage boys, including Diaz, and "met with" them.

—— <u>April 3, 2018</u> (2 points): Diaz and another Hispanic teenager were found skipping school and smoking marijuana in a park. The police report states that the two teenagers were "known to the officer as verified MS-13 gang members"[13] and had a "history of carrying weapons," but none of the prior reports in the gang package mention Diaz carrying a weapon. The officer did a pat frisk of the two teens and found an aluminum baseball bat in the right pant leg of Diaz's companion, which the officer confiscated. The teens were warned about smoking marijuana in a park and released.

---

[13] Prior to this FIO, Diaz had only accrued nine points -- enough to be considered a gang "associate" using the BPD's point system, but not a gang "member," as the police report represents. <u>See</u> <u>Rule 335 - Gang Assessment Database</u>, at 2.

-— May 28, 2018 (2 points): Diaz was "loitering" with three other Hispanic teenagers whom the officer conducting the FIO "knew" to be MS-13 members.

-— June 1, 2018 (4 points assigned for two FIOs): (1) Diaz was seen with a group of teenagers in front of a building where one member of the group lived, which officers noted was "a known hangout and address" for MS-13 members; and (2) Diaz was stopped with two other teenagers, one of whom officers believed had a warrant out for his arrest, but when the officers ran their names there were no outstanding warrants.

-— June 21, 2018 (2 points): Diaz was sitting on the track benches of the East Boston Stadium after hours with four other teenagers, three of whom were "verified" MS-13 "associates." Officers told them to leave. A notation on the report made by HSI Special Agent Connolly observes that the East Boston Stadium is "notorious for MS-13 gang activity."

-— August 1, 2018 (2 points): Officers stopped Diaz and two other Hispanic teenagers as they were walking out of a park. Diaz was wearing a backpack and told the officers that he had a metal chain with a padlock in it that he used for his bicycle. A notation made by Special Agent Connolly on a gang intelligence bulletin about the encounter comments that "MS-13 gang members commonly carry large metal chains with locks to be used in gang related assaults." The officers confiscated the chain and padlock

and released the three teenagers.  Nothing in the gang package suggests that Diaz ever used the bike chain and lock as a weapon.

## II.

In advance of his merits hearing, Diaz submitted to the immigration court his asylum application and supporting evidence, including an affidavit by criminal justice professor and former Boston Police Officer Thomas Nolan.  Professor Nolan's credentials as an expert witness are extensive.  He served as an officer in the Boston Police Department for twenty-seven years and as a lieutenant for nine years.  Since leaving the Department, he has taught criminal justice courses at six colleges and universities and written an academic book on policing issues, see Thomas Nolan, Perilous Policing: Criminal Justice in Marginalized Communities (2019), as well as numerous articles and essays on the subject. Professor Nolan concludes that Diaz "should not have been listed as a verified gang member" in the BRIC Gang Assessment Database because the "intelligence" about Diaz does not comply with federal regulations governing shared criminal intelligence databases in the Code of Federal Regulations (CFR).  See generally 28 C.F.R. Part 23.  The regulations are implicated, Professor Nolan explains, because the Gang Assessment Database "is an interjurisdictional shared database that [is] accessible to other agencies," like DHS.

Part 23 of the Code's Title 28 was originally adopted in 1980 to ensure that the operation of criminal intelligence systems

- 30 -

was not undertaken "in violation of the privacy and constitutional rights of individuals," Criminal Intelligence Systems Operating Policies, 45 Fed. Reg. 40,156, 40,156 (June 13, 1980), a purpose that has remained unchanged, see 28 C.F.R. § 23.1. The regulations provide that entities that operate "interjurisdictional intelligence system[s]," see id. § 23.3(b)(5), like BRIC, "shall collect and maintain criminal intelligence information concerning an individual only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity," id. § 23.20(a). Such entities

> shall not collect or maintain criminal intelligence information about the political, religious or social views, associations, or activities of any individual or any group . . . unless such information directly relates to criminal conduct or activity and there is reasonable suspicion that the subject of the information is or may be involved in criminal conduct or activity.

Id. § 23.20(b).

Professor Nolan emphasizes that Diaz faced no criminal charges for any of the incidents documented in the Boston gang database and that "there was no direct relation between these encounters and any reasonable suspicion of [Diaz's] involvement in criminal activity." Thus, Professor Nolan concludes, the information about Diaz "should not be contained within the database" and is "not reliable."

Drawing on Professor Nolan's critiques, and arguing that the gang package was also unreliable because it contained mistakes and inconsistencies, Diaz objected to its introduction at his merits hearing, characterizing the evidence as fundamentally unfair. The IJ overruled Diaz's objection without explanation and admitted the gang package. After the hearing, but before the IJ rendered a decision, Diaz submitted a supplemental brief focused specifically on the gang package and reiterating the arguments he made at the hearing. He also described the point system used by the Boston Police Department and argued that it "can criminalize normal teenage behaviors such as associating with others of the same ethnicity." And he included in his brief a two-and-a-half-page chart detailing the inconsistencies throughout the gang package -- for example, he flagged that the April 3, 2018, police report mentions his "history of carrying weapons" but that no prior entries describe him carrying weapons. Diaz therefore asked the IJ not to consider the gang package or, if the IJ did consider it, to give it "minimal weight" in analyzing his application for relief.

Without addressing Diaz's arguments about the unreliability of the gang package, the IJ found that Diaz was "not credible pertaining to his gang membership," and remarked that Diaz "alleges that he is not an MS-13 gang member, despite the

plethora of evidence found within" the gang package.  The IJ continued by explaining that,

> [t]roublingly, the Respondent stated that a Christian cannot be a member of MS-13; however, the evidence indicates that he likely is a MS-13 member.  Given the significant evidence that the Respondent is a MS-13 gang member, the Court casts great doubt on whether the Respondent is actually an [E]vangelical Christian.

Thus, the IJ used the gang package to find that Diaz's asserted Christian faith was not credible.

Then, relying on the adverse credibility determination, the IJ found that Diaz had not met his burden to prove statutory eligibility for asylum.  The IJ also found that Diaz did not merit a favorable exercise of discretion because of his gang membership, and that he did not qualify for withholding of removal or relief under the Convention Against Torture.

In his subsequent appeal to the BIA, Diaz argued that the IJ violated his due process rights by relying on the gang package to conclude that he was not credible on the question of his gang membership.  Looking at the totality of the evidence, the BIA concluded that the adverse credibility determination of the IJ was not clearly erroneous.  In so ruling, the BIA dispatched in a lengthy footnote Diaz's legal argument that it was fundamentally unfair, and thus a due process violation, for the IJ to rely on the gang package to undermine his credibility.

Specifically, the BIA rejected as "not borne out by the record" Diaz's assertion of inconsistencies in the gang package. Rather, the BIA stated, the reports "consistently indicate that the respondent associated with known MS-13 gang members in areas of Boston frequented by the gang and carried gang-related weapons." The BIA noted Professor Nolan's critique of the gang package, including his assertion that including Diaz in the gang database violates federal regulations because the database does not identify the information giving "rise to a reasonable suspicion that the respondent participated in criminal activity." In response, without identifying any criminal activity by Diaz, the BIA observed that "the professor does not explain why the respondent's associations with known MS-13 gang members in areas frequented by the gang, along with the fact that gang-related weapons were found on his person, do not give rise to a reasonable suspicion."

However, the BIA did not address Professor Nolan's critique that the "known MS-13 members" with whom Diaz was seen associating might themselves have been identified as such based on the same problematic foundation. Nor does the BIA explain why, absent evidence of specific criminal activity by Diaz, his inclusion in the gang database was consistent with the federal regulations governing the collection of intelligence data. Finally, the BIA deemed significant that "counsel has not presented

evidence that the respondent has been removed from the Boston police's database because his inclusion was unlawful."

<h2 style="text-align:center">III.</h2>

Although "the 'Federal Rules of Evidence do not apply in [DHS] proceedings[,] . . . the less rigid constraints of due process impose outer limits based upon considerations of fairness and reliability.'" Toribio-Chavez v. Holder, 611 F.3d 57, 66 (1st Cir. 2010) (first alteration in original) (quoting Yongo v. I.N.S., 355 F.3d 27, 30 (1st Cir. 2004)).  The purpose of due process in "the realm of factfinding[] is to minimize the risk of erroneous decisions," and "the quantum and quality of the process due in a particular situation" varies as needed to advance the objective of accurate decision-making.  Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 13 (1979).

At a minimum, the government must give "a person in jeopardy of serious loss . . . notice of the case against him and opportunity to meet it."  Mathews v. Eldridge, 424 U.S. 319, 348 (1976) (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)).  But "[t]he opportunity to provide reasons . . . why proposed action should not be taken" is meaningless if the decisionmaker dismisses those reasons out of hand, Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985), and the risk to accurate decision-making is

especially acute when the disregarded challenge goes to the reliability of core facts.

To prevail on a due process claim in the immigration context, a petitioner "must show that a procedural error led to fundamental unfairness as well as actual prejudice." Conde Cuatzo v. Lynch, 796 F.3d 153, 156 (1st Cir. 2015). Diaz asserts that the agency's uncritical reliance on the gang package, despite the obvious flaws demonstrated by Professor Nolan's report and Diaz's own forceful challenge to the evidence in his post-hearing brief, was both fundamentally unfair and prejudicial.

## A. Fundamental Unfairness

Unmistakably, the IJ and BIA both gave the gang package, and in particular the conclusion that Diaz is an "active" member of MS-13, dispositive weight. We previously have rejected a challenge to the agency's reliance on similar reports, noting that "[n]othing in the record compels us to find that the police and other government reports were so obviously unreliable as to render the agency's reliance on them an abuse of the agency's wide discretion." Miranda-Bojorquez v. Barr, 937 F.3d 1, 7 (1st Cir. 2019); see also Arias-Minaya v. Holder, 779 F.3d 49, 54 (1st Cir. 2015) ("[I]t is settled beyond hope of contradiction that . . . immigration courts may consider police reports even when they rest largely on hearsay."). Although we noted that limits on the use of such materials exist, we observed that "those limits

are generally satisfied as long as the trier first determines that the report is reliable and that its use would not be fundamentally unfair."  Arias-Minaya, 937 F.3d at 54.

Here, Diaz submitted abundant evidence to bolster his objections to the gang package, yet the IJ and BIA gave that evidence barely a glance.  When the gang package is closely scrutinized in the context of the full record -- as it must be, with the stakes so high -- it does not support the conclusion that Diaz was an "active" member of MS-13 with reliable information that meets the regulatory standard for collecting criminal intelligence.  The finding of gang involvement is flawed in multiple respects.

First, Diaz's reported conduct does not support an inference that he was involved in criminal activity at all, let alone the kinds of violent crimes for which MS-13 is infamous.[14] Diaz was entered into the Gang Assessment Database based on the points he accrued from interactions with purported MS-13 members, not for engaging in gang-related criminal activity himself. Indeed, all of the information about Diaz that appears in the database was gathered during FIOs, encounters that police officers may initiate "without any information indicating that the

_____

[14] Presumably, the arrest of Diaz by ERO and HSI in August 2018 was based solely on Diaz's supposed status as a gang member, not criminal activity, as no criminal conduct is noted anywhere in the DHS memorandum reporting the arrest.  See supra Section I.

individual has been or is presently engaged in criminal activity." Narcisse, 927 N.E.2d at 443. The regulations in 28 C.F.R. Part 23 plainly prohibit entities like BRIC from collecting "criminal intelligence information" about an individual unless "there is reasonable suspicion that the individual is involved in criminal conduct or activity." 28 C.F.R. § 23.20(a) (emphasis added). Simply associating with people who may be engaged in criminal activity is not enough. Thus, the data about Diaz in the BRIC Gang Assessment Database does not meet the standard for "criminal intelligence information," as Professor Nolan concludes, and it should never have been submitted to the database.

My colleagues correctly point out that those regulations "are not a rule about admissibility or an exclusionary rule." But that observation misses the point. Diaz does not argue that the regulations categorically preclude IJs from admitting and relying on BRIC Gang Assessment Database documents. Rather, he argues that, in this case, the gang package does not reliably establish that he is a gang member, in part because it fails to comply with the regulations.

Remarkably, in rejecting Professor Nolan's opinion about the unreliability of the gang database information, the BIA found it significant that Diaz's counsel had not presented evidence that Diaz's name had been "removed from the Boston police's database because his inclusion was unlawful." It was error for the BIA to

- 38 -

presume that Diaz could have taken such a step. There is no mechanism through which a person can challenge his designation as a gang member and inclusion in the BRIC Gang Assessment Database.[15] See Yawu Miller, Are There Really 160 Gangs in Boston?, Bay State Banner (July 30, 2019), https://www.baystatebanner.com/2019/07/30/are-there-really-160-gangs-in-boston/. Recognizing the lack of any such procedure, the government now suggests on appeal that Diaz should have brought suit under 42 U.S.C. § 1983 to have his name removed from the database. It is absurd, however, to place the onus on a respondent in removal proceedings to bring a slow, costly, burdensome federal civil lawsuit to challenge his wrongful inclusion in a law enforcement database. The fact that Diaz did not pursue that course to get his name removed from the database does not make the information in the database reliable.

Second, there is no explanation in this record of the basis for the point system employed by the Boston Police Department. Diaz specifically raised the disconnect between the points assessed and actual gang affiliation. Yet the IJ and BIA accepted the point system uncritically, even though it is unclear how the Department determined what point values should attach to what conduct, or what point threshold is reasonable to reliably

---

[15] In contrast, California requires local law enforcement agencies to notify individuals whose names are included in its gang database, CalGang, of the process through which they can contest that designation. Cal. Penal Code § 186.34(c)(1)-(2).

establish gang membership.  See Rule 335 - Gang Assessment Database, at 2-3.  Indeed, scholarly critiques of gang databases that employ similar point systems have recognized their tendency to cast too wide a net.  See, e.g., Kevin Lapp, Databasing Delinquency, 67 Hastings L.J. 195, 210 (2015) ("The broad criteria for inclusion in gang databases, and the discretion afforded to law enforcement in deciding whom to include, make it difficult for young people living in gang-heavy communities to avoid qualifying criteria."); K. Babe Howell, Fear Itself: The Impact of Allegations of Gang Affiliation on Pre-Trial Detention, 23 St. Thomas L. Rev. 620, 649 (2011) (remarking that the criteria for inclusion in gang databases are generally "almost entirely unrelated to criminal conduct or even to active participation in gang activities" and create "the potential for false positives"); Joshua D. Wright, The Constitutional Failure of Gang Databases, 2 Stan. J. C.R. & C.L. 115, 125 (2005) ("The subjective criteria used to document gang members . . . reinforce the suspicion that databases, even if properly managed and administered, are excessively over inclusive and overstate minority participation rates.").

In addition, as this case illustrates, the point system is applied in a haphazard manner.  Diaz was assigned points for most, but not all, of his documented interactions with purported MS-13 members.  When he was assigned points, he was not always assigned the same number per interaction.  Although he was assigned

two points for "contact" with alleged gang members or associates on most occasions, he was assigned five points for one "Intelligence Report" submitted by the Boston School Police.

Furthermore, the people with whom Diaz interacted were likely "verified" as gang members using the same problematic point system. As Professor Nolan points out in his affidavit, "it is unclear from the information provided by the Gang Assessment Database how any other named individuals were verified as members of MS-13. Given the problems with [Diaz's] inclusion as a 'verified member,' it is possible that these individuals also should not have been included."

In rejecting Diaz's due process challenge, the BIA ignored this basic problem with the government's evidence and discredited Professor Nolan's views simply because Diaz had "associated with known MS-13 gang members" in areas frequented by gang members and possessed "gang-related weapons," i.e., a bike chain and lock. In other words, while acknowledging that Professor Nolan had raised serious doubts about the gang reports' reliability, the BIA responded to those concerns in circular fashion -- relying on the questionable data about Diaz's peers to deflect the criticism of the questionable data about Diaz.

Most troubling of all, Professor Nolan's critique of the Boston Police Department's point system highlights its potential for criminalizing ordinary behaviors of minority youth, such as

spending time with peers of the same ethnicity. The system creates a self-perpetuating cycle that is devastating in its application in immigration proceedings. Individuals are assigned points based on their associations, which leads to their classification as a gang member, which results in heightened police attention to their activities, additional observations of their associations, and the assignment of additional points. Although Diaz was never seen engaging in the kinds of violent crime for which MS-13 is notorious -- or any criminal activity, for that matter -- he was labeled an MS-13 gang member based solely on associations with his peers in the East Boston community where he lived. It is just such guilt-by-association -- developed through "violation of the privacy and constitutional rights of individuals" -- that the federal regulations governing criminal intelligence gathering were designed to prevent. See supra Section II (quoting Criminal Intelligence Systems Operating Policies, 45 Fed. Reg. 40,156, 40,156 (June 13, 1980)).

Put simply, Diaz was denied relief from removal based on quintessential teenage behavior -- hanging out with friends, who unsurprisingly were also young Hispanic men. The record lacks any evidence that those social encounters were linked to criminal activity that would have been a proper basis for recording them, and any explanation by the government as to why the point system is nevertheless a reliable means of determining gang membership.

The flaws in the gang package, which Diaz brought to the attention of the IJ and BIA, cast serious doubt upon the accuracy of Diaz's classification as a gang member. The IJ's and BIA's uncritical reliance upon that evidence denied Diaz an "accurate determination of the matters before the court," Heller v. Doe by Doe, 509 U.S. 312, 332 (1993), and rendered the agency proceedings fundamentally unfair.

## B. Prejudice

In the context of an immigration appeal, "a 'due process claim cannot succeed without prejudice; without prejudice, any error that occurred would be harmless.'" Toribio-Chavez, 611 F.3d at 66 (quoting Hossain v. Ashcroft, 381 F.3d 29, 32 (1st Cir. 2004)). Prejudice is established "when it is shown that an abridgement of due process is likely to have affected the outcome of the proceedings." Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008).

The IJ relied on the gang package to find that Diaz was "not credible pertaining to his gang membership" and that he likely was a member of MS-13. The IJ then expressed "great doubt" as to whether Diaz is an Evangelical Christian, the basis upon which he claimed asylum, because of his gang membership. In doing so, the IJ gave the gang package dispositive weight in assessing Diaz's credibility. Based on that adverse credibility determination, the IJ discounted Diaz's testimony about the harm he had experienced

in El Salvador, found that Diaz had not demonstrated past persecution on account of a statutorily protected ground (his religion), and found that Diaz failed to establish that he had an objectively reasonable fear of future persecution. The IJ also concluded that, even if Diaz was statutorily eligible for asylum, he would have denied Diaz's application on discretionary grounds because of Diaz's gang affiliation. In short, the gang package permeated every aspect of the IJ's decision denying Diaz's asylum claim.

My colleagues suggest that, apart from the gang package, the IJ properly relied on two inconsistencies in Diaz's testimony when making the adverse credibility determination and, thus, the IJ was entitled to discount Diaz's testimony on that basis. But a line of questioning that supposedly produced a major inconsistency in Diaz's testimony was anchored in the flawed gang package -- that is, the IJ's questions about how Diaz traveled around Boston undoubtedly stemmed from the police report that Diaz's backpack held a bike lock and chain, items that authorities say are used as weapons by MS-13 members. More importantly, however, closer examination reveals that Diaz's testimony was consistent and the IJ erred in finding otherwise.

After Diaz's attorney finished her direct examination, the IJ posed a series of questions to Diaz that included the subject of his transportation:

                    how do you get from one place to the other?
               JUDGE TO MR. DIAZ-ORTIZ:
                    What is your method of transportation,
               meaning
               MR. DIAZ-ORTIZ TO JUDGE:
                    What do you mean, what do you mean? I
               don't understand the question.
               JUDGE TO MR. DIAZ-ORTIZ:
                    When you, when you travel in your
               community, what transportation do you use?
               MR. DIAZ-ORTIZ TO JUDGE:
                    Train.
               JUDGE TO MR. DIAZ-ORTIZ:
                    Always?
               MR. DIAZ-ORTIZ TO JUDGE:
                    Yes. Well, when I lived in, in my house
               where I lived in, in East Boston, I didn't
               because it was close, but when I lived in
               Boston, I, I had to use the train.
               JUDGE TO MR. DIAZ-ORTIZ:
                    Do you have a car?
               MR. DIAZ-ORTIZ TO JUDGE:
                    No.

Diaz required the assistance of a Spanish interpreter at his

hearing, and it is clear that he was confused by this line of

questioning. The IJ then concluded with a leading question: "So,

you never traveled anywhere except by train, correct?" Diaz

responded in the affirmative.

        On cross-examination, after the government introduced

the gang package, the DHS attorney asked Diaz why he told the

police that he had the chain and padlock for his bicycle when he

had told the IJ that he only traveled by train. Diaz responded,

in line with his prior testimony: "Well, when I lived in East

Boston, of course, I had the bicycle there to go around and, and

do things around there, but when I lived in Boston and I took the

train, I couldn't bring the bike anymore."  The IJ then interrupted

the DHS attorney's next question to press Diaz on the issue:

> JUDGE TO MR. DIAZ-ORTIZ:
>     Do you remember that I specifically asked you whether you used any other means of transportation, yes or no?
> MR. DIAZ-ORTIZ TO JUDGE:
>     Oh, yes, yes, I remember when you said that.
> JUDGE TO MR. DIAZ-ORTIZ:
>     And you told the Court that you did not use any other means of transportation other than a train? Is that correct?
> MR. DIAZ-ORTIZ TO [DHS ATTORNEY]:
>     [Not translated].
> JUDGE TO MR. DIAZ-ORTIZ:
>     No, I didn't ask for a reason why.
> MR. DIAZ-ORTIZ TO JUDGE:
>     Yes, you said that, but --
> JUDGE TO MR. DIAZ-ORTIZ:
>     I'm just asking you what you told the court.
> JUDGE TO [DHS ATTORNEY]:
>     Next question.

Diaz's statement that the train was his only mode of transportation

was in response to a leading question by the IJ.  In contrast, his

responses to open-ended questions posed by both the IJ and the DHS

attorney were consistent -- he traveled by train when he lived in

Boston, but he did not need the train when he lived in East Boston.

And, as Diaz points out in his brief, he was living in East Boston

when he was found with the bike chain and lock.[16]

---

[16] The Field Interview Report documenting the FIO where the police recovered the bike chain and lock from Diaz lists Diaz's home address, with the zip code 02128 -- an East Boston zip code. Look Up a Zip Code, U.S. Postal Service,

Another inconsistency identified by the IJ concerned Diaz's religion. The IJ found that Diaz varied in his testimony as to whether his family's store in El Salvador -- which sold religious objects -- was owned by him or other family members. The IJ observed: "At first during his testimony, [Diaz] stated that he owned a store that sold Christian paraphernalia. However, he later revisited this fact and stated that the store actually belonged to his family." The IJ's statement is patently wrong. The hearing transcript reveals that, to the extent there was inconsistency, it resulted from the IJ's confused and confusing questioning.

When Diaz first mentioned the store, he testified that he worked with his parents when he lived in El Salvador and that "we did have a store" that sold Bibles and other merchandise. He never said that the store belonged to him. After Diaz's attorney concluded her questioning on that topic, the IJ posed several additional questions:

> JUDGE TO MR. DIAZ-ORTIZ:
>     Mr. Diaz, the photographs that you were presented earlier, are those photographs of your store on the street?
> MR. DIAZ-ORTIZ TO JUDGE:
>     Yes, of course, that's my mother and father's store.
> JUDGE TO MR. DIAZ-ORTIZ:
>     My question is, are those pictures of the store that you said was yours in El Salvador?

https://m.usps.com/m/ZipLookupAction (click "Search for a City by ZIP Code," then type "02128" in the text box and click "Search").

- 47 -

```
MR. DIAZ-ORTIZ TO JUDGE:
     Yes, they are, yes.
. . .
JUDGE TO MR. DIAZ-ORTIZ:
     So, these are pictures of the store that
belongs to your mother and your father,
correct? It's not a picture of --
MR. DIAZ-ORTIZ TO JUDGE:
     Yes, yes, they are.
JUDGE TO MR. DIAZ-ORTIZ:
     -- a store that belongs to you, correct?
MR. DIAZ-ORTIZ TO JUDGE:
     No, not, not to me. It's the family's, it
belongs to the family.
```

(emphasis added). The IJ misinterpreted Diaz's prior testimony, in which he consistently reported that the store belonged to his family. Notably, the BIA explicitly did not rely on this purported inconsistency when it upheld the IJ's adverse credibility determination. Inexplicably, however, the majority does rely on it, concluding that "both of the indicia used by each of the IJ and the BIA as to lack of credibility were properly considered." Like the IJ, my colleagues are plainly wrong.

In sum, neither inconsistency identified by the IJ independently supports the adverse credibility determination. Moreover, that credibility determination was inescapably controlled by the gang package, and credibility was the express basis upon which the IJ denied Diaz's application for asylum. Thus, it is not reasonably debatable that the IJ's reliance on the fundamentally unfair gang package prejudiced Diaz.

**IV.**

MS-13 is a Central American gang originally created by Salvadorans in Los Angeles that now operates primarily in the "northern triangle" countries: El Salvador, Guatemala, and Honduras. Clare Ribando Seelke, Cong. Research Serv., RL34112, Gangs in Central America 1-4 (2016), available at https://fas.org/sgp/crs/row/RL34112.pdf. MS-13 also recruits members in the United States. See id. at 3. There is unquestionably a need for federal and state law enforcement authorities to monitor and control the activities of MS-13 and other gangs that engage in criminal activity in this country. But that need does not justify intelligence gathering by police that treats the mere proximity of any young Hispanic man to his peers -- even those suspected to be gang members -- as gang-related activity. That inferential leap crosses the line from legitimate monitoring to racial profiling.

This is not a theoretical concern. A 2015 report on the Boston Police Department's field interrogation observation practices "revealed racially disparate treatment of minority persons in BPD FIO activity." Jeffrey Fagan, et al., Final Report: An Analysis of Race and Ethnicity Patterns in Boston Police Department Field Interrogation, Observation, Frisk, and/or Search Reports 20 (2015), available at https://s3.amazonaws.com/s3.documentcloud.org/documents/2158964/full-boston-police-

analysis-on-race-and-ethnicity.pdf. Indeed, data released by the Boston Police Department last year shows that nearly all individuals tracked in the BRIC gang database are "young black and Latino men." Philip Marcelo, <u>Inside the Boston Police Gang Database</u>, WGBH News (July 30, 2019), https://www.wgbh.org/news/local-news/2019/07/30/inside-the-boston-police-gang-database. The 2015 report found that "at least some of the racial disparity in FIO encounters" can be attributed to "intense police attention to gang members by Boston Police, including <u>reputed gang members who may have had no criminal history</u>." Fagan et al., at 12 (emphasis added). Notwithstanding the importance of addressing gang activity, it is simply unacceptable for aggressive policing to single out racial minorities, subjecting them to unfair and unreliable law enforcement practices.

The 2015 report on the Boston Police Department's FIO practices was not presented to the IJ during Diaz's merits hearing, and, accordingly, it has no bearing on whether the IJ and BIA committed a legal error by crediting the gang package. Nonetheless, the report highlights the fundamental unfairness in the ready acceptance by the IJ and the BIA of the ostensibly damning evidence in the gang package. "The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions." <u>Greenholtz</u>, 442 U.S. at 13. By accepting at face

value the gang package's identification of Diaz as a gang member, despite compelling evidence revealing that finding's flimsy foundation, the agency neglected its obligation "to guard against the risk of erroneous deprivation."  Allen v. Illinois, 478 U.S. 364, 374 (1986).  That cursory acceptance of such facially powerful evidence to deny relief in immigration proceedings is the epitome of fundamental unfairness, and the resulting high likelihood of error is the essence of a due process violation.

Hence, we should vacate the BIA's ruling and remand this case for renewed consideration of Diaz's application on the basis of reliable evidence.  I respectfully dissent.